254 S.W.3d 432 (2007)
In re J.C.D., J.D.D., J.A.M., E.O.M., T.D.M., & Q.O.M.
No. E2007-01266-COA-R3-PT.
Court of Appeals of Tennessee, Eastern Section, at Knoxville.
Assigned on Briefs October 15, 2007.
November 30, 2007.
Permission to Appeal Denied February 21, 2008.
*435 Ben H. Houston II, Knoxville, Tennessee, for the appellant, J.D.M.
Robert E. Cooper, Jr., Attorney General and Reporter, and Lauren S. Lamberth, Assistant Attorney General, Nashville, Tennessee, for the Appellee, State of Tennessee, Department of Children's Services.
Permission to Appeal Denied by Supreme Court February 21, 2008.

OPINION
SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.
Upon petition of DCS, the juvenile court terminated Mother's parental rights to her six children upon a determination that Mother had failed to substantially comply with requirements of her permanency plans, that conditions that led to the children's removal from the home still persisted and that termination was in the best interest of the children. On appeal, Mother argues that there was not clear and convincing evidence of statutory grounds for termination or that termination was in the children's best interest. Mother also argues that DCS did not make reasonable efforts to reunite Mother and the children, that the juvenile court erred in finding statutory grounds for terminating the Mother's parental rights to T.D.M. and Q.O.M., who were opposed to termination, before appointing a preference guardian to represent them, and that termination of parental rights to Q.O.M. was prohibited absent his consent because he was over fourteen years of age at the time of termination. We hold that the evidence does not preponderate against the juvenile court's finding that there was clear and convincing evidence of at least one statutory ground for termination of Mother's parental rights, that termination of Mother's parental rights was in the children's best interest, and that DCS made reasonable efforts to reunite Mother and the children. We further hold that the juvenile court was not required to appoint a preference guardian ad litem before trying the issue of whether there were statutory grounds for the termination of parental rights as to T.D.M. and Q.O.M. despite their opposition to termination and that the consent of Q.O.M. was not a prerequisite to termination of Mother's parental rights despite *436 the fact that he was over fourteen years of age. Accordingly, we affirm the judgment of the juvenile court.

I. Background
In this appeal, we address the termination of parental rights of J.D.M. ["Mother"][1] to her six children  J.C.D. (DOB: August 23, 2004); J.D.D. (DOB: August 23, 2004); J.A.M. (DOB: June 6, 2002); E.O.M. (DOB: May 14, 2000); T.D.M. (DOB: January 4, 1994); and Q.O.M. (DOB: December 4, 1990). In November of 2004, the Department of Children's Services ("DCS") filed a petition for temporary custody of the children. By order of the Knox County Juvenile Court entered November 22, 2004, custody of all six children was placed with DCS upon a finding that the children were dependent and neglected, based upon sworn allegations set forth in DCS's petition that Mother left the children unattended for a period in excess of seven hours, and may have left the children unattended overnight and that Mother "had services in and out of the home since about 2000, to address drug dependency issues for cocaine, and lack of supervision." Thereafter, the twin children, J.C.D. and J.D.D., were placed in the foster care of one family, and the other children, J.A.M., E.O.M., T.D.M., and Q.O.M., were placed in the foster care of a different family.
On December 9, 2004, DCS drafted permanency plans with regard to each child with the stated goal of reuniting Mother and the children. On June 1, 2005, the juvenile court entered its final order finding the six children to be dependent and neglected due to Mother's substance abuse and because she left the children without appropriate supervision.
The permanency plans were revised on September 9, 2005, by changing the plans' goal from reunification solely to "reunify with parent/adoption." The permanency plans were again modified on July 17, 2006, at which time the plans' goal was changed to "adoption" alone because the children had been in custody since November 22, 2004, without reaching permanency. At that time, the plans were further modified to include the requirement that Mother attend and complete a high-risk parenting group to address medical/behavioral needs of the two youngest children, J.D.D. and J.C.D., both of whom were born cocaine positive as a result of Mother's drug use during her pregnancy.
Approximately one month after staffing the third version of the permanency plans, DCS filed a petition to terminate Mother's parental rights to her six children upon grounds, inter alia, that Mother failed to substantially comply with responsibilities set forth in her permanency plans and failed to remedy conditions that had led to the children's removal from her home. At trial on May 30, 2007, the guardian ad litem presented letters from the two oldest children, T.D.M. and Q.O.M., indicating their opposition to Mother's parental rights being terminated and on this basis, requested a continuance pending the juvenile court's appointment of a preference guardian ad litem pursuant to Tenn. Sup. Ct. R. 40(e). Upon agreement of all the parties, the trial proceeded as to whether there were statutory grounds for termination of Mother's parental rights as to all of the children. The issue of whether termination would be in the best interest of J.C.D., J.D.D., J.A.M., and Q.O.M. was also tried; however, as to T.D.M. and *437 Q.O.M., the best interest inquiry was continued to a later date, pending appointment of a preference guardian ad litem.
At the conclusion of trial, the juvenile court determined that DCS had presented clear and convincing evidence of statutory grounds for the termination of Mother's parental rights as to all six children. Specifically, the court found sufficient proof to show 1) Mother failed to substantially comply with the requirements of the permanency plans by failing "to successfully complete substance abuse treatment and establish a drug-free lifestyle" and 2) that the children had been removed from the home for six months and that the conditions which led to their removal persisted or other conditions persisted which in all probability would cause the children to be subjected to further abuse and neglect and that there was little likelihood that these conditions would be remedied at an early date. The juvenile court further found that termination of Mother's parental rights was in the best interest of J.C.D., J.D.D., J.A.M., and E.O.M. and accordingly, ordered that Mother's parental rights be terminated as to those four children. A preference guardian ad litem was appointed for T.D.M. and Q.O.M., and after a further hearing on June 12, 2007, the juvenile court determined that termination of Mother's parental rights was in their best interest also and therefore, entered its order terminating Mother's parental rights as to those two children as well. Mother now appeals.

II. Issues Presented

Mother presents several issues for our review which are restated as follows:
1) Whether there was clear and convincing evidence of statutory grounds for termination of Mother's parental rights.
2) Whether the juvenile court erred in trying the case with regard to the existence of statutory grounds for termination of Mother's parental rights as to T.D.M. and Q.O.M. before appointing a preference guardian ad litem on their behalf.
3) Whether DCS made reasonable efforts to reunite Mother with her children.
4) Whether there was clear and convincing evidence that termination was in the children's best interest.
5) Whether the juvenile court was required to obtain Q.O.M.'s consent to terminate Mother's parental rights as to him because he was over fourteen years of age.

III. Analysis

A. Standard of Review
A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); Hawk v. Hawk, 855 S.W.2d 573, 578-79 (Tenn.1993); Ray v. Ray, 83 S.W.3d 726, 731 (Tenn.Ct.App. 2001). Although this right is fundamental and superior to claims of other persons and the government, it is not absolute. State v. C.H.K., 154 S.W.3d 586, 589 (Tenn. Ct.App.2004). This right continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. Blair v. Badenhope, 77 S.W.3d 137, 141 (Tenn.2002). Although "parents have a fundamental right to the care, custody, and control of their children," this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. In re Drinnon, 776 S.W.2d 96, 97 (Tenn.Ct.App.1988) (citing Stanley v. Illinois, *438 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)).
Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger, "severing forever all legal rights and obligations of the parent." Tenn.Code Ann. § 36-1-113(l)(1). The United States Supreme Court has recognized the unique nature of proceedings to terminate parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." M.L.B. v. S.L.J., 519 U.S. 102, 119, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996) (quoting Santosky v. Kramer, 455 U.S. 745, 787, 102 S.Ct. 1388, 1412, 71 L.Ed.2d 599 (1982) (Rehnquist, J., dissenting)). As a result, "[t]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." Id. The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. O'Daniel v. Messier, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995). This most drastic interference with a parent's rights requires "the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." In re Swanson, 2 S.W.3d 180, 188 (Tenn.1999).
Termination proceedings are governed by statute in Tennessee. Parties who have standing to seek the termination of a biological parent's parental rights must first prove at least one of the statutory grounds for termination. Tenn.Code Ann. § 36-1-113(c)(1). Secondly, they must prove that termination of the parent's rights is in the child's best interest. Tenn.Code Ann. § 36-1-113(c)(2). Because the decision to terminate parental rights has profound consequences, courts must apply a higher standard of proof in deciding termination cases. Therefore, to justify termination of parental rights, the party seeking termination must prove by clear and convincing evidence the ground (or grounds) for termination and that termination is in the child's best interest. Tenn.Code Ann. § 36-1-113(c); In re Adoption of A.M.H., 215 S.W.3d 793, 808 (Tenn.2007); In re Valentine, 79 S.W.3d 539, 546 (Tenn.2002).
The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. In re C.W.W., 37 S.W.3d 467, 474 (Tenn.Ct.App.2000); In re M.W.A., Jr., 980 S.W.2d 620, 622 (Tenn. Ct.App.1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, State v. Demarr, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn.Ct.App.M.S., Aug. 13, 2003), no appl. perm. filed, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. Valentine, 79 S.W.3d 539, 546 (Tenn.2002); In re S.M., 149 S.W.3d 632, 639 (Tenn.Ct.App.2004); In re J.J.C., 148 S.W.3d 919, 925 (Tenn.Ct. App.2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. In re A.D.A., 84 S.W.3d 592, 596 (Tenn.Ct.App.2002); Ray v. Ray, 83 S.W.3d 726, 733 (Tenn.Ct.App.2001); In re C.W.W., 37 S.W.3d at 474.
In a non-jury case such as this one, we review the record de novo with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R.App. P. 13(d); Union Carbide v. Huddleston, 854 S.W.2d 87, 91 (Tenn.1993). *439 When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to either as to the trial court's factual findings. Seals v. England/Corsair Upholstery Mfg. Co., Inc., 984 S.W.2d 912, 915 (Tenn.1999). The trial court's specific findings of fact are first reviewed and are presumed to be correct unless the evidence preponderates against them. We then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. In re S.M., 149 S.W.3d 632, 640 (Tenn.Ct.App.2004). The trial court's conclusions of law are reviewed de novo and are accorded no presumption of correctness. Campbell v. Florida Steel Corp., 919 S.W.2d 26, 35 (Tenn.1996); Presley v. Bennett, 860 S.W.2d 857, 859 (Tenn.1993).

B. Substantial Noncompliance with Permanency Plan
The first issue we address is whether there was clear and convincing evidence before the trial court to support its finding of a statutory ground for terminating Mother's parental rights. Tennessee Code Annotated § 36-1-113(g) sets forth the various grounds upon which initiation of termination may be based, one of which is that "there has been substantial noncompliance by the parent or guardian with the responsibilities in a permanency plan or plan of care. . . ." Addressing termination of parental rights on this ground in In re M.J.B., 140 S.W.3d 643 (Tenn.Ct. App.2004), we observed that the plan requirements must be reasonable and related to resolving the problems that resulted in removal and that the parent's noncompliance must be substantial:
Terminating parental rights based on Tenn.Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn.Code. Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, In re Valentine, 79 S.W.3d at 547; In re L.J.C., 124 S.W.3d 609, 621 (Tenn.Ct.App.2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. In re Valentine, 79 S.W.3d at 548-49; In re Z.J.S., 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. In re Valentine, 79 S.W.3d at 548; Department of Children's Servs. v. C.L., No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn.Ct.App. Aug.29, 2003) (No Tenn. R.App. P. 11 application filed).
In re M.J.B. at 656-57.
As we have noted, three permanency plans were approved by the juvenile court in this case after the removal of the children from the home in November of 2004. Among the requirements set forth in all three plans were the following:
[Mother] will experience a drug free lifestyle that permits her to care for her children and meet their needs.
. . .
[Mother] will enroll and complete an alcohol and drug program and will follow all recommendations for aftercare. [Mother] will submit to random drug *440 screens to show her commitment to sobriety.
. . .
[Mother] will enroll and complete all anger management classes and will follow all recommendations for any follow up treatment. [Mother] will when interacting with the children demonstrate the skills learned in the classes.
. . .
[Mother] needs to enroll and complete a parenting class that will address the issues of all ages of her children. During visitation times [Mother] needs to demonstrate skills learned in the classes such as but not limited to: appropriate discipline, effectively listening to her children, adequate use of time among all her children, use of positive reinforcement, and other techniques taught. [Mother] will during visits bring age appropriate snacks and toys for the children to have.
At the request of DCS and or [guardian ad litem], Mother will undergo a parenting assessment and/or bonding assessment with her children.
. . .
Mother will continue to take all medications as prescribed and will follow all recommendations of her psychiatrist as to needed therapy and/or other mental health needs.[2]
As previously noted, the third plan included the additional requirement that with respect to J.C.D. and J.D.D., Mother enroll in a high-risk parenting class to address the medical and/or behavioral needs of those two children.
We find that the purpose of each of these plan requirements was to the create a safe and nurturing environment for the children, and accordingly, we conclude that the requirements were reasonable and related to eliminating the problems that led to the children's removal from the home. Mother presents no argument to the contrary.
As set forth in its order of June 6, 2007, entered after the trial of May 30, 2007, the juvenile court's determination that Mother was in substantial noncompliance with her responsibilities under the permanency plans was based upon findings of fact that are supported by the record and are not disputed:
These children were removed from [Mother's] care due to her history of cocaine dependence, leaving the children unattended for hours at a time, and failing to cooperate with intervention services. On the day of the removal the children were found once again at home with no adult supervision. When [Mother] was located, she told the investigator to take them because she was "sick and tired of people calling in referrals." She said she had things to do and couldn't always take her children with her.
[Mother] has had several permanency plans since the children entered foster care and her responsibilities have been essentially the same over time. She participated in staffing each plan and was well aware of her responsibilities.
. . .
[Mother] completed anger management classes and, according to her case manager, has demonstrated progress in her interactions. She is in compliance with psychiatric treatment and taking medications most of the time as prescribed. But she has failed to complete the training *441 necessary to care for her youngest children and she has failed to accomplish the most important task on her permanency plan  becoming and remaining clean and sober.
[Mother] testified that she entered the residential substance abuse program at KARM (Knox Area Rescue Ministry) fifteen days ago. This is at least her tenth attempt at treatment. Within the last year she failed to successfully complete the previous program at KARM, failed to complete treatment at Sisters of the Rainbow, and failed to complete treatment at Peninsula. She relapsed after each attempt. She was arrested on or about May 1, 2007, when she sold drugs to an undercover agent in a "drug-free zone" (near a school) and was in jail for ten days. A few days after a friend bonded her out, she entered KARM. According to her testimony, she has now been clean for thirty days. Her longest period of sobriety until now has been sixty days.
[J.C.D.] and [J.D.D.], Mother's youngest children, are fraternal twins born drug-exposed and with significant medical problems. [Mother] admitted that she used cocaine during this pregnancy in an attempt to abort them. Both children are subject to viral infection and asthma requiring close monitoring, breathing treatment, and occasional hospitalization. Both children have feeding problems related to sensory disorders, although the problems are not the same. [J.C.D.] has been diagnosed failure to thrive and almost required a feeding tube due to his refusal to eat. The children are currently participating in a therapeutic feeding group. They attend some form of therapy every Tuesday and Thursday (occupational therapy, physical therapy, speech therapy or feeding group). . . . [Mother] was offered the opportunity to work with the children's therapists to gain the knowledge and skills necessary to care for them. Participating in those sessions twice weekly would have given her an opportunity to have frequent visitation with them. [Mother's] case manager transported her at first and then contracted with a private agency to provide that transportation to every session. [Mother] failed to participate beyond a few sessions. She was either not at home when the driver arrived, or not answering the door, or no longer living at the address she had given. The service was eventually withdrawn due to non-compliance. Therapy sessions, of course, continued and [Mother] was still welcome to participate but she made no attempt to do so and did not even contact her case manager to ask about attending or arranging another form of transportation. [Mother] has not seen these children at all for several months.
[Mother] . . . has managed to see her four children only two times this calendar year. She failed to attend Foster Care Review Board in January, where the children were present, and failed to attend any visits that month. She missed two of the four visits scheduled in February and has not seen the children since. Her testimony was that she was stressed out. She says that she was not mentally or physically well in March. In April she was using drugs and couldn't deal with her children right then. By May she was in jail. She attributes her neglect of her children to being high and having a lot of other things going on in her life. She had things to do. Housing was stressing her out. Disagreements with the twins' father were stressing her out.
All of these factual findings are supported by the record. Although Mother does not contend that any of these findings *442 were erroneous, she maintains that she substantially complied with her permanency plans by participating in anger management training, attending parenting classes, and continuing her mental health treatment. We acknowledge, as did the juvenile court, that Mother satisfied some requirements of her permanency plans; however, we do not agree that this constituted "substantial" compliance. As we indicated in In re M.J.B., cited above, "the importance of the particular requirement that has not been met" must be considered in determining whether a parent's noncompliance was "substantial." It is quite evident from the record before us that the primary reason for Mother's inability to properly care for her children was her ongoing drug dependency and thus, we agree with the juvenile court's conclusion that her failure to comply with her plans' requirement that she lead a drug free lifestyle constitutes substantial noncompliance. Mother argues that "she was showing significant progress toward experiencing a drug free lifestyle," "had been enrolled in the Serenity Shelter inpatient drug treatment program at the Knox Area Rescue Ministries for sixteen days," and "had been clean and sober for almost thirty days at the time that her termination of parental rights trial was held." While we hope that these most recent efforts by Mother to overcome her drug dependency problem lead to a permanent resolution of her problem, they are insufficient to overcome the facts of her previous multiple relapses, her failure to successfully complete various drug treatment programs during the year preceding termination, and her selling of drugs in a school zone within one month of trial. Mother herself admitted at trial that her history of staying clean and sober was "abysmal," and the fact that she did not use drugs during the thirty days preceding the May 30, 2007, hearing must be discounted by the fact that she was incarcerated from May 1 until May 11, 2007, during which period of time her access to drugs would have been curtailed.
In addition to Mother's failure to lead a drug free lifestyle, we find that Mother substantially failed to comply with her permanency plans' requirements by failing to participate in therapy sessions that would have prepared her to care for her two youngest children, J.C.D. and J.D.D. Both of these children suffer from ongoing medical problems that require extraordinary attention as attested by DCS case manager, Marquita Andrew:
They have major ongoing sinus problems that require specialized knowledge, it requires special equipment, they have to have ongoing breathing treatments, they have to see doctors almost daily throughout the week. They have speech therapy, occupational therapy needs, they will have ongoing training for the rest of their life. One of them we just barely got past having to have a feeding tube put in because he was losing weight. . . . They have been diagnosed failure to thrive on multiple occasions and they have ongoing specialized needs for  they have everything from very specific training and exercises that have to be done at home to every doctor known to man.
Ms. Andrew further testified that DCS arranged for Mother to participate in high-risk training classes that would enable her to participate in the twins' treatment and that initially, she personally transported Mother to those classes, and subsequently, DCS paid for a taxicab service to transport Mother to these classes. However, the service was discontinued because of Mother's noncompliance:
She wouldn't call the provider to make sure that they were coming, or they showed up and she wasn't there and she *443 hadn't told them where she was going or that she wasn't going to attend that day. And that was on several occasions. They tried to connect to her and she didn't return the phone call. . . .
In summary, we find that the juvenile court's finding that Mother did not substantially comply with her permanency plans is supported by clear and convincing evidence and consequently, a statutory ground existed for termination of her parental rights.

C. Persistent Condition
As noted, the juvenile court also found a ground for termination of Mother's parental rights by reason of the persistence of a condition that led to the children's removal from the home pursuant to Tenn.Code Ann. § 36-1-113(g)(3) which provides that parental rights may be terminated under the following circumstances:
(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.
The children in this case had been removed from the home for a period of six months at the time DCS filed its petition to terminate parental rights, and as already outlined in this proceeding, conditions that led to the children's removal persisted and there was little likelihood these conditions would be remedied at an early date given Mother's history of relapse. Mother argues on appeal that none of the children would be available for adoption for several months following trial because the parental rights of the children's fathers had not yet been terminated and therefore, it was not shown that the continuation of the parent-child relationship between Mother and the children "greatly diminishe[d] the children's early integration into a safe, stable and permanent home." However, there is no indication in the record that Mother raised this as an issue at trial, and it is well settled that issues not presented to the trial court may not be presented for the first time on appeal. Smith v. Harriman Util. Bd., 26 S.W.3d 879, 887 (Tenn.Ct.App.2000). Accordingly, we hold this argument to have been waived, and we deem the juvenile court's finding of statutory grounds for termination under Tenn.Code Ann. § 36-1-113(g)(3) to be adequately supported by the evidence.

C. Preference Guardian Ad Litem
Mother next argues that the juvenile court should have appointed a preference guardian ad litem to represent the interests of T.D.M. and Q.O.M. before trying the issue of whether there were statutory grounds for termination of Mother's parental rights and that the juvenile court's failure to do so constituted reversible error.
In pertinent part, Tenn. Sup.Ct. R. 40(e) provides for the appointment of a preference guardian ad litem as follows:

*444 (1) If the child asks the guardian ad litem to advocate a position that the guardian ad litem believes is not in the child's best interest, the guardian ad litem shall:
(i) Fully investigate all of the circumstances relevant to the child's position, marshal every reasonable argument that could be made in favor of the child's position, and identify all the factual support for the child's position;
(ii) Discuss fully with the child and make sure that the child understands the different options or positions that might be available, including the potential benefits of each option or position, the potential risks of each option or position, and the likelihood of prevailing on each option or position.
(2) If, after fully investigating and advising the child, the guardian ad litem is still in a position in which the child is urging the guardian ad litem to take a position that the guardian ad litem believes is contrary to the child's best interest, the guardian ad litem shall pursue one of the following options:
(i) Request that the court appoint another lawyer to serve as guardian ad litem, and then advocate for the child's position while the other lawyer advocates for the child's best interest.
(ii) Request that the court appoint another lawyer to represent the child in advocating the child's position, and then advocate the position that the guardian ad litem believes serves the best interests of the child.
As stated previously, at the beginning of trial on May 30, 2007, Heather Inman, the appointed guardian ad litem, requested that the juvenile court appoint a preference guardian ad litem because of the opposition of T.D.M. and Q.O.M. to the termination of Mother's parental rights. Ms. Inman stated that her request was prompted by letters written by T.D.M. and Q.O.M. which respectively provided as follows:
I'm [T.D.M.] & I'm not at court today because my foster parents took the family on vacation to [D]isney [W]orld. I think we will get adopted if we are I will be disappointed & sad. But if I'm wrong and don't get adopted I will be happy. This is why I'm not here today and what I think is going to happen.
and
To Whom it May Concern:
I won't be attending Court today because we are going on vacation. I think what might happen is that my mother's parental rights will be terminated. If that does happen, I won't like it at all. I will be very angry with the situation and mad at any specific person.
Sincerely,
[Q.O.M.]
After reviewing these letters, the juvenile court asked all parties if there was "[a]ny objection to taking the proof with regard to all of the children and holding the best interest portion of the hearing for the two children who have objected until later." There were no such objections and the court proceeded as indicated. Mother argues that the juvenile court committed reversible error by failing to continue the whole case until a preference guardian ad litem had been appointed because Q.O.M. and T.D.M. were thereby denied the right to cross examine witnesses and because additional evidence presented by a preference guardian ad litem "might well have changed the outcome of this trial." We do not agree.
First of all, it is manifest from the language of Rule 40 that the sole concern of the rule is that the child's perspective be included in determining what is in the child's best interest. It calls for the *445 appointment of a preference guardian ad litem to advocate the child's position when the child urges "a position that the guardian ad litem believes is contrary to the child's best interest." (Emphasis added). It does not call for the appointment of a preference guardian ad litem when the child disagrees that there are statutory grounds for termination. As we have previously stated, "[t]he best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the [statutory] grounds for termination." In re Audrey S., 182 S.W.3d 838, 877 (Tenn. Ct.App.2005). See also In re C.B.W., No. M2005-01817-COA-R3-PT 2006 WL 1749534, at *6 (Tenn. Ct.App. Md. Section, filed June 26, 2006), (noting that different considerations apply with regard to the determination of grounds and best interest); "One important distinction is that grounds are generally established on the basis of the parent's past actions. Best interest, by its nature, must focus on the current situation and, to some extent, is based on a prediction of future events."). By continuing the best interest portion of the trial as to Q.O.M. and T.D.M. until after the appointment of a preference guardian, the juvenile court preserved the rights of those two children consistent with Tenn. Sup.Ct. R. 40.
Furthermore, as we have stated, there was clear and convincing evidence for the juvenile court's determination that there was at least one statutory ground for terminating Mother's parental rights, that being Mother's failure to maintain a drug free lifestyle in contravention of the requirements of her permanency plans. We have set forth the juvenile court's findings of fact supporting its decision in this regard, including its finding that during the pendency of her permanency plans, Mother failed to complete separate drug rehabilitations at KARM, Sisters of the Rainbow, and Peninsula, and that each such effort ended in relapse. We have also noted the juvenile court's finding that Mother was engaged in an attempt to sell drugs near a school within one month of the initial termination trial. These findings alone are sufficient to support the conclusion that Mother failed to substantially comply with her permanency plan which required that she experience a drug free lifestyle. Mother does not contest the validity of any of these findings. Mother further attested that she used cocaine approximately thirty days before trial, and we cannot see how the cross examination of witnesses or presentation of additional evidence by a preference guardian ad litem would have dictated any conclusion other than that Mother contravened the requirements of her permanency plans by failing to lead a drug free lifestyle. Accordingly, we find that had the juvenile court committed error in proceeding to try the case as to statutory grounds such error would have been harmless.

D. Reasonable Efforts of DCS
Mother next argues that the juvenile court's order terminating her rights should be reversed because DCS failed to comply with Tenn.Code Ann. § 37-1-166 which provides that DCS must make "reasonable efforts" to "[m]ake it possible for the child to return home." We disagree.
In In re Giorgianna, 205 S.W.3d 508 (Tenn.Ct.App.2006), we restated the standard to which DCS is held in endeavoring to reunite the family after removal of a child from the home:
While the Department's reunification efforts need not be "herculean," the Department must do more than simply provide the parents with a list of services and send them on their way. The Department's employees must use their superior *446 insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan. . . . [T]he Department's reunification efforts are "reasonable" if the Department has exercised "reasonable care and diligence . . . to provide services related to meeting the needs of the child and family." Tenn.Code Ann. § 37-1-166(g)(1)(2005). The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.
The Department does not have the sole obligation to remedy the conditions that required the removal of children from their parents' custody. When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well. Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody.
In re Giorgianna, 205 S.W.3d at 519 (Citations omitted).
Applying this standard to the case at bar and upon our careful review of the record, we hold that the evidence does not preponderate against the conclusion that DCS made reasonable efforts to reunite Mother and her children. We have already referenced the testimony of DCS case manager Marquita Andrew as to the efforts DCS made in arranging for Mother to participate in high-risk training classes for J.C.D. and J.D.D. and in transporting Mother to those classes. Ms. Andrew also testified as to other efforts she made on behalf of Mother as follows:
Q. When you have talked to her about what she needed to do in order to get her children back, what have you told her?
A. Lots of different things. Trying everything I could think of to get her to do something. We have talked to her about going to her alcohol and drug treatment, what would help her stay in her program. What about having extra visits, extra time, would that be a motivator, vice-versa. . . . We have talked about her ability to maintain an apartment, or an inability in this case. A place to stay. We have talked about her being dependent on men, other friends, to pay the bills or to get things for her. We have talked to her about what it takes to essentially corral that group of kids. . . .
Q. What have you done to help her?
A. Well, like I said, everything I could think of. We tried to make appointments for her, I picked her up from her doctor's appointments when I could or when she needed to. We have talked to her about getting alternative transportation, what it would take for her to be able to go and get somewhere and get back. That kind of thing.
Q. And provided it for her?
A. Yes, ma'am.
Q. Has there ever been an issue with her getting into a treatment program?
A. Yes.

*447 Q. Have you assisted her in getting into treatment?
A. We have tried.
Q. And she's gotten treatment?
A. Yes.
Under cross examination, Ms. Andrew further testified as follows regarding her efforts in getting Mother into treatment programs for her substance abuse:
Q. And you also said that you had helped get [Mother] into some treatments for her [alcohol] & [drug] issues?
A. Yes, ma'am.
Q. What programs were those?
A. We made phone calls from the office for Peninsula.
Q. Who is we?
A. [Mother] and I.
Q. And that was for Peninsula?
A. Yes, ma'am.
Q. Was that just one time or was that several times? Do you remember how many?
A. I don't remember offhand.
Q. Do you remember when that was?
A. Oh, gosh. Not really. It's been off and on when she has been back and forth between treatment programs.
In addition to these efforts to place Mother in programs to train her to deal with her children's medical needs and her substance abuse problems, we note DCS's efforts in arranging and supervising visits between Mother and her children.
Based upon the record before us in this case, we cannot agree with Mother's contention that DCS failed to make reasonable efforts to reunite her with her children.

E. Best Interest
Next, Mother argues that the juvenile court erred in finding that there was clear and convincing evidence that termination of her parental rights was in the best interest of her children.
In addition to finding by clear and convincing evidence that at least one statutory ground exists to terminate parental rights, the court must also find that the termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). In making a determination of best interest, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or *448 guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.
Tenn.Code Ann. § 36-1-113(i). Further, as this court stated in In re Audrey S.,
[A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests.
. . .
Ascertaining a child's best interests does not call for a rote examination of each of Tenn.Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.
In re Audrey S., 182 S.W.3d at 878 (citations omitted).
Several factors in the instant case warrant a finding that termination of Mother's parental rights is in the best interest of her children. The record shows that Mother continued to abuse drugs during the pendency of her permanency plans, was tested positive for cocaine and arrested for attempting to sell drugs approximately thirty days prior to trial and has failed to avail herself of training that would allow her to properly care for her two youngest children, J.D.D. and J.C.D. She has thereby 1) failed to make an adjustment of conduct as to make it safe and in her children's best interests to be in her home; 2) failed to make a lasting adjustment despite reasonable efforts by DCS; and 3) demonstrated a use of drugs as may render her unable to care for her children. Mother also failed to visit her children on a regular basis, testifying that she last visited the four older children in February of 2007 and could not remember if she visited them in January of that year. Finally, we find that there is clear and convincing evidence that a change in caretakers would have a detrimental on the condition of the children. In this regard as to J.C.D. and J.D.D., we note the testimony of their foster parent (identified as "Ms. Foster") with whom they had resided for the two and one-half years preceding trial. She testified that she accompanies these children to occupational therapy and feeding therapy twice a week. She further testified as follows as to the effect of Mother's presence at the "very few" therapy sessions that Mother attended:
Q. Were you present when [Mother] participated?
A. Yes.
Q. Would you tell us what happened?
A. It was scary for the children. [J.C.D.] especially, he shut down, he didn't want to participate, it scared him. A lot of tears, lot of fear. A lot of quivering on his lip.
Q. What did she do?
A. She was forceful, I think angry. Seemed to be angry toward them that *449 they didn't want to have anything to do with her.
Q. Did she participate and follow the instructions of the provider?
A. No, not always. A lot of observing and I think it seemed to be pouting, kind of sitting back because she didn't want to have anything to do with her, and it was almost like she seemed to take it out on them.
While Ms. Andrew attested that Mother does not have the skills necessary to care for J.C.D. and J.D.D., evidence was presented that Ms. Foster works with those children on all of the exercises that are performed in therapy, and Ms. Andrew testified that J.C.D. and J.D.D. are doing well in their foster home and that there are no current health concerns in their regard. As to J.A.M. and E.O.M., Ms. Andrew testified that "[t]hey are participating in sports, they have very good social connections, they go to church, [and] . . . [t]hey're doing well in school. Their emotional stability has improved greatly." At the best interest hearing conducted with respect to Q.O.M. and T.D.M., each child attested that he/she is doing well in school, and both agreed that while they love their Mother, they do not want to live with her if she is using drugs.
In sum, after careful review of the record, we cannot agree that the evidence preponderates against the juvenile court's conclusion that termination of Mother's parental rights was in the best interest of her children.

F. Consent of Child Over Fourteen
As a final matter, we address Mother's argument that the trial court was prohibited from terminating her parental rights to Q.O.M. without his consent because he was over the age of fourteen at the time of termination. Mother contends that "[b]ecause terminating the parental rights of a child's natural parents is a pre-requisite for adoption, it necessarily follows that children over the age of fourteen (14) must also consent to their natural parents' parental rights being terminated." We do not agree.
We acknowledge Tenn.Code Ann. § 36-1-117(i)(1) which provides in pertinent part as follows:
When the child who is the subject of adoption is fourteen (14) years of age or older at any time before the granting of the petition, the adoption court must receive the sworn, written consent of such child to the adoption, which shall be filed with the record, and the consent of such minor shall be recited in the order of adoption.
Mother cites no authority in support of her argument that the consent required of the child in the adoption context is also a prerequisite to termination of parental rights. Instead, she relies solely upon an asserted analogy between adoption and termination. We find no authority supporting Mother's argument, and we do not agree that there is an analogy between adoption and termination of parental rights that supports Mother's argument. Termination entails the severing of parental rights. Adoption has the opposite goal of establishing by court order the legal relationship of parent and child. Tenn.Code Ann. § 36-1-102(4). It does not follow from the mere facts that termination of parental rights is a prerequisite to adoption and that consent of a child over fourteen is also a prerequisite to adoption that the consent of the child over fourteen is a prerequisite to termination. As we have indicated above, if a child is opposed to the termination of parental rights recourse may be had to Supreme Court Rule 40 which insures that the child's preference is considered in determining *450 whether termination is in the child's best interest. We find no merit in Mother's argument that her parental rights to Q.O.M. could not be terminated absent his consent.

IV. Conclusion
For the foregoing reasons, we affirm the judgment of the juvenile court. Costs of appeal are assessed to the appellant, J.D.M.
NOTES
[1] J.C.D., J.D.D., and J.A.M. have the same biological father, while it appears that each of the other children has a different biological father. None of the children's fathers are parties to this appeal.
[2] The record shows that Mother has been diagnosed schizophrenic.