IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 29, 2015 Session

## IN RE: THOMAS T.

**Direct Appeal from the Juvenile Court for Knox County
No. 40322      Timothy E. Irwin, Judge**

_____

**No. E2014-02369-COA-R3-PT-FILED-NOVEMBER 16, 2015**

_____

This appeal involves the termination of a father's parental rights to his seven-year-old son. In 2011, the son was adjudicated dependent and neglected due to his parents' substance abuse and was placed in the custody of his paternal great-aunt and great-uncle. In 2013, the same great-aunt and great-uncle filed a petition, as prospective adoptive parents, seeking to terminate the father's parental rights on the statutory grounds of abandonment and persistent conditions. The trial court found that the grounds of abandonment and persistent conditions were proved by clear and convincing evidence. The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Michael J. Stanuszek, Knoxville, Tennessee, for the appellant, Thomas J. T.

Hillary Dewhirst, Knoxville, Tennessee, for the appellees, Tina J. D'A. and Mark S. D'A.

**OPINION**

**I. FACTS & PROCEDURAL HISTORY**

Thomas T.[1] (hereinafter "Thomas" or "Child") was born out-of-wedlock to Heather M. ("Mother") and Thomas J. T. ("Father") in October 2008. Mother's parental

---

[1]In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity. In this case, in order to preserve both clarity and the anonymity of the child, we will redact the names of individuals sharing the child's surname and will refer to those individuals by their given name and the first letter of their surname.

rights were terminated by default judgment in November 2014.[2]   Father is currently serving a six-year prison sentence for aggravated burglary.   Thomas lives with the Appellees, his paternal great-aunt and great-uncle ("Aunt" and "Uncle").

As a result of pervasive and habitual drug use by Mother and Father between his birth in 2008 and when he was placed in the care of Aunt and Uncle in 2011, Thomas bounced from the custody of his parents to other family members and the Tennessee Department of Children's Services ("DCS").   On multiple occasions, after responding to referrals for a drug-exposed infant, DCS found it necessary to petition the juvenile court in order to secure Father's compliance with its investigations.   Father twice failed to obey court orders requiring him to comply with DCS investigations, leading to Thomas being placed in the custody of his paternal great-grandmother in September 2009.   Thomas was removed from his great-grandmother's custody after the juvenile court found that the great-grandmother facilitated visitation with the Father, who was required to pass a drug screen prior to having any supervised contact with Thomas.   Thomas was placed with Aunt and Uncle for a short time before being returned to Mother in June 2010.   In April 2011, Thomas was removed from Mother's custody and placed in foster care until he was again placed with Aunt and Uncle in July 2011, having been adjudicated dependent and neglected due to his parents' substance abuse.   Thomas has lived with Aunt and Uncle since the July 2011 placement.

Aunt and Uncle filed a petition to terminate Father's parental rights in August 2013, alleging abandonment by willful failure to support, abandonment by willful failure to visit, abandonment by wanton disregard for the child, and persistent conditions.   Aunt and Uncle then filed a motion to amend their petition in February 2014 to include allegations of "severe child abuse."   The juvenile court heard testimony in this matter on November 19, 2013, July 29, August 8, August 11, and November 25, 2014.

The court first heard testimony from Max Russell, the DCS worker who investigated several drug exposed child referrals pertaining to Thomas, beginning in 2009.   Russell testified that Father admitted to smoking marijuana on multiple occasions and subsequently failed to complete alcohol and drug assessment programs as recommended by DCS and later required by court orders.   He further testified that he had seen Mother with a black eye during one of his visits and also that Father "threatened to shoot people . . . who come on their property."

Aunt testified that she personally observed Father using marijuana in Thomas's great-grandmother's home with Thomas present.   She reportedly saw drug paraphernalia littered throughout the home, including syringes and blackened spoons.   Her testimony

---

[2]Mother did not appeal.

indicated that she observed Father under the influence of drugs and witnessed Father arguing with Mother, shoving Mother into walls and punching Mother in her face. She also testified that she saw Father hit Mother with Thomas present. Additionally, she recounted that she last saw Father using drugs in 2012.

Responding to questions regarding Father's history of visiting Thomas, Aunt stated that Thomas "wouldn't know [Father] from anybody else" and that Father had done nothing to further his relationship with Thomas. She testified that Father last visited Thomas in November 2011, eight months before he was incarcerated in August 2012. According to her, Father did not try to contact or visit Thomas in the eight months before his incarceration. She admitted that she has no knowledge of anything Father has done to better himself while in prison nor does she have any knowledge regarding Father's drug use in prison.

Aunt's testimony also shed light on improvements in Thomas's life since his placement with her and Uncle. She testified that when Thomas first came to live with her, he was underweight and hoarded food in his bedroom. She explained that Thomas initially exhibited behavioral problems and frequently had night terrors. However, she also noted that Thomas's well-being had improved considerably over the past three years and that he was actively engaged in school and outside activities. She also emphasized that she and Uncle love and treat Thomas like he was their own child. The court also heard from Uncle, who corroborated Aunt's testimony.

At the time of trial, Father was serving a six year sentence for aggravated burglary in Knox County and expected to be released on parole in May 2015. In contrast to testimony offered by the DCS worker and Aunt, Father testified that he had never hit or threatened physical violence against a woman but conceded that at least one order of protection had been entered against him. During his testimony, Father described a significant history of drug use and admitted that he did not complete his required alcohol and drug assessment programs in part because they were "all the way out on Gallaher Road in West Knoxville." In fact, when his mother was diagnosed with cancer in 2011, his drug use increased "a hundred fold." In his testimony, Father also rebutted Aunt and Uncle's description of his visitation history with Thomas. He indicated that he does not believe he violated the court's no contact order because he lived in the home where the contact with Thomas occurred. He also disputed Aunt's testimony that he did not attempt to visit or contact Thomas during the four months preceding his incarceration. By his estimation, he attempted to visit Thomas and contacted Aunt and Uncle "at least 50 times" but was told by them that his visits must take place through Parent Place. Father recollected that when he attempted to see Thomas, Aunt called the police on him five or six times.

3

Father's testimony also touched on the improvements he has made in his life while incarcerated. He stated that, as of the hearing, he had been in a drug program for one month and passed three drug screens. He testified that he believes his improvement will continue once he is released from prison and that he can connect with Thomas, protect him, and care for him.

The court found insufficient proof for willful failure to support and severe child abuse, but for reasons discussed below, found that Father abandoned Thomas by willful failure to visit and wanton disregard and found that the conditions which led to Thomas being removed still persisted. The court also found by clear and convincing evidence that terminating Father's parental rights was in Thomas's best interest. Consequently, the court entered an order terminating Father's parental rights. Father appeals.

## II. ISSUES PRESENTED

Father presents the following issues, as slightly reworded, for review:

1. Whether the juvenile court correctly found that Father abandoned the child by failing to visit?

2. Whether the juvenile court correctly found that Father abandoned the child by exhibiting a wanton disregard for the welfare of the child?

3. Whether the juvenile court correctly found that conditions that led to the removal of the child from Father's custody still persist or other conditions exist which would cause the child to be subject to further abuse or neglect?

4. Whether the juvenile court correctly found that it is in the best interest of the child to terminate Father's parental rights?

For the following reasons, we affirm the decision of the juvenile court.

## III. STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432. 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *In re J.C.D.,* 254 S.W.3d at 437. A parent's right

4

"continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate parental rights are governed by statute. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *In re Audrey S.*, 182 S.W.3d at 860. Several grounds for termination are listed in subsection (g), but the existence of any one of the grounds listed in the statute will support a decision to terminate parental rights. *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010); *In re S.R.C.*, 156, S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Audrey S.*, 182 S.W.3d at 860. "In light of the constitutional dimension of the rights at stake in a termination proceeding, . . . the persons seeking to terminate these rights must prove all the elements of the case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). In sum, in order to terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Clear and convincing evidence" has been defined as "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Valentine*, 79 S.W.3d 532, 546 (Tenn. 2002)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

On appeal, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). We review each of the trial court's specific factual findings *de novo* in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming the finding to be correct unless the evidence preponderates against it. *Id.*; Tenn. R. App. P. 13(d). Questions of law are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586 (Tenn. 2010).

## IV. DISCUSSION

### *A. Abandonment Generally*

Appellees first alleged abandonment by willful failure to visit and abandonment by wanton disregard for the child pursuant to Tennessee Code Annotated section 36-1-113(g)(1) and Tennessee Code Annotated sections 36-1-102(1)(A)(i) and (iv), respectively. In pertinent part, Tennessee Code Annotated section 36-1-113(g) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> > (1) Abandonment by the parent or guardian, as defined in 36-1-102, has occurred; . . .

Tenn. Code. Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
> > (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;
> > . . . .
> > (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-1-102(A)(i) and (iv).

Here, because Father was incarcerated in August 2012, a year before Appellees filed the instant proceeding, and remained incarcerated through the filing of this petition, we focus on the four months preceding Father's incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv).

In order for a court to terminate a parent's parental rights on the ground of abandonment, that abandonment must be willful. *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864 (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)).

"Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). As previously discussed, this Court "reviews questions of law de novo with no presumption of correctness." *Id.*

### B. Abandonment by Willful Failure to Visit

We begin by examining the trial court's finding that Father abandoned Thomas by willfully failing to visit. In its written findings, the court stated

> [t]hat as to the ground of abandonment of [Thomas] in that [Father] has willfully failed to visit (or to engage in more than token visitation) as defined in § 36-1-102(1)(A)(i), pursuant to T.C.A. § 36-1-113(g)(1), this Court finds that [Father] did fail to visit for at least eight months prior to being incarcerated, the time when the child needed him; . . .

Because Father was incarcerated during the four months prior to the institution of these proceedings, Tennessee Code Annotated section 36-1-102(1)(A)(iv) provides that the applicable review period is the four months prior to Father's incarceration. While the court incorrectly cited subsection (i) of § 36-1-102(1)(A) in its findings, opposed to subsection (iv), the court and each of the parties correctly employed the proper four month period for inquiry into Father's visitation. Aunt and Uncle testified that Father had not visited or contacted Thomas during an eight month period prior to his incarceration. Father's testimony conflicts with that of Aunt and Uncle, in that Father claims he attempted to visit Thomas "at least 50 times." In contrast, Aunt and Uncle's attorney offered into evidence a letter written by Father from prison apologizing for not having tried to contact them in the months before his incarceration. The court seemed to

address these conflicts by noting that it found Father's "credibility to be very low" and "pretty much zero throughout the process." The court also found that Appellees "in this case have a much higher degree of reliability." The trial judge alone has the unique opportunity to observe the demeanor of the witness while testifying and to make credibility determinations. *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Accordingly, "the trial judge, on an issue which hinges on witness credibility, will not be reversed unless there is found in the record concrete and convincing evidence, other than the oral testimony of the witnesses, which contradicts the trial court's findings." *Bowman,* 836 S.W.2d at 566 (citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974)).

On appeal, Father admits that he did not visit or contact Thomas within the four months preceding his incarceration but repeats his argument that he attempted to do so and was rebuffed by Aunt and Uncle each time. The record simply does not reflect that Father seriously attempted to visit Thomas any time during the requisite four month period or that he was prevented from doing so. Given our deference to a trial court's determination of witness credibility and given our review of the record, we discern no error and therefore, affirm. *See Bowman*, 836 S.W.2d at 566.

## C. Abandonment by Wanton Disregard

Next, we examine the juvenile court's finding that Father abandoned Thomas by demonstrating a wanton disregard for Thomas's welfare pursuant to § 36-1-102(1)(A)(iv). At the hearing, the court stated that it was "[e]asy to find wanton disregard . . . when [Father was] out breaking into people's houses and when [Father was] using drugs and getting high . . . ." This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005) (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App. Jan. 11, 2005), *perm. app. denied* (Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004) (*no perm. app. filed*); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474-75 (Tenn. Ct. App. 2000)). Further,

> parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. . . . A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child.

*In re Audrey S.*, 182 S.W.3d at 866 (citing *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 958). The record before us is replete with evidence that Father's conduct displayed a wanton disregard for his child's welfare within the meaning of § 36-1-102(1)(A)(iv) and applicable case law. Father's laundry list of criminal offenses in conjunction with his lengthy history of drug abuse provides what the juvenile court described as "overwhelming proof" in this case. Discerning no error, we affirm the judgment of the juvenile court with respect to the ground of abandonment by wanton disregard.

### D. Persistent Conditions

The statutory ground for termination that is commonly referred to as "persistent conditions" is defined in Tennessee Code Annotated section 36-1-113(g)(3):

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). In order to terminate parental rights, there must be clear and convincing evidence of each of these elements. *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002). "The purpose behind the 'persistent conditions' ground for terminating parental rights is 'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576 at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9, (Tenn. Ct. App. Mar. 3, 2008)). In cases involving this ground, it is not necessary to prove that a parent-child relationship cannot be salvaged, nor is it necessary to show that a parent is "currently harmful" to a child's safety or future emotional stability." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

The statutes governing termination of parental rights recognize a child's need for a permanent, stable environment. *Id.* Accordingly, the question is the likelihood that the child can be safely returned to the custody of the parent, not whether the child can safely remain in foster care with periodic visits with the parent. *Id.*

Here, the record reflects that Thomas was removed from his father's custody by order of a court for a period greater than six months. In fact, by the time of the hearing, Thomas had been in the custody of Aunt and Uncle for three years. Therefore, the determinative issues are whether the conditions that led to removal (or other conditions that would cause further abuse or neglect and prevent the child's safe return) still persist; whether there is a likelihood that these conditions will be remedied at an early date so that the child can be safely returned to Father "in the near future;" and whether continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home. *See* Tenn. Code Ann. § 36-1-113(g)(3).

The condition that led to Thomas's removal from his parents' custody in 2009 was illegal drug abuse. Father admitted to smoking marijuana and taking opiates, including oxycodone and hydrocodone, regularly prior to his incarceration. Father has been provided numerous opportunities to complete drug treatment programs in order to regain custody of Thomas and has failed to do so. Further, Father admits that his drug use escalated "a hundred-fold" during the time his mother was diagnosed with cancer and before she died in 2012. The juvenile court found that the conditions that led to Thomas's removal not only persisted, but actually worsened. Father's testimony indicated that he entered a drug treatment program in prison and passed three consecutive drug screens in that program. However, the trial court's findings noted that "changes in [Father's] condition that have been made for the positive have been forced on [him] by prison," rather than being a personal "adjustment of circumstances." Finding no error with the juvenile court's determination that the conditions that led to Thomas's removal still persist, we affirm with respect to persistent conditions.

### E. Best Interest

Once grounds for termination have been established, the focus shifts to whether termination of a parent's rights is in the best interest of the child. *In re Adoption of Angela E.*, 402. S.W.3d 636, 639 (Tenn. 2013); *In re F.R.R. III*, 193 S.W.3d 528, 530 (Tenn. 2006). Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive. In addition, "the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest." *In re Arteria H.*, 326 S.W.3d 167, 182 (Tenn. Ct. App. 2010). "The best interest of a child must be

determined from the child's perspective and not the parent's." *Id.* (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacob M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)). Like the juvenile court, we find that the evidence clearly and convincingly establishes that it is in Thomas's best interest for Father's parental rights to be terminated. By the time of trial, Thomas was five years old and had lived with Aunt and Uncle for over three years. Aunt testified regarding the difference she has observed in Thomas since coming to live with her. Initially, Thomas was underweight and "would hoard food." He would cry if left alone, and he was frightened of the potential of a hot shower. He also had difficulty sleeping and trouble interacting with other children and teachers at school and at church. However, Aunt testified that, since coming to live with them, Thomas is "completely a different little boy." She shared that she believes Thomas is "happy" and that Aunt and Uncle "take him camping and fishing and to birthday parties, to church, to Awanas, to the swimming pool, everything."

Aunt testified that she and her husband can provide a "stable, drug-free, happy life" for Thomas. On the other hand, Aunt stated that she believes Thomas would "be devastated" if he were to return to living with Father. She testified that she loves Thomas like a son and that she was prepared to adopt and provide a permanent home for him.

The juvenile court found "by clear and convincing evidence that it is in the child's best interest to terminate [Father's] parental rights and it is in the best interest of the child to stay where he is with [Aunt and Uncle.]" The court stated that it "has not seen such overwhelming proof in a case in a long time, and this was only bolstered by [Father's] total lack of credibility as a witness. . . ." The court also found that no meaningful relationship existed between Father and Thomas and that it "cannot see any feasible way that it could ever approve giving the child back to [Father]."

From our review of the record, the statutory best interest factors weigh heavily in favor of terminating Father's parental rights. Father has not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home. Father did not maintain regular visitation with Thomas prior to incarceration, nor has he shown the ability to provide a healthy and safe environment for Thomas, free of drugs and criminal activity. For all of these reasons, we affirm the trial court's finding that termination of Father's parental rights is in Thomas's best interest.

## V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby

affirmed.  Costs of this appeal are taxed to the appellant, Thomas J. T., for which execution may issue, if necessary.

_____
BRANDON O. GIBSON, JUDGE