IN THE COURT OF APPEALS OF
TENNESSEE
AT NASHVILLE
Assigned on Briefs July 31, 2015


**IN RE BRITTANY D.**


**Appeal from the Juvenile Court for Putnam County**
**No. TPR2014JT3     John P. Hudson, Judge**


_____


**No. M2015-00179-COA-R3-PT – Filed September 9, 2015**

_____


In this termination of parental rights case, the minor child was taken into custody by the Tennessee Department of Children's Services ("DCS") in February 2014 shortly after Mother's return to jail following the child's birth during a furlough.  In June 2014, DCS filed a petition to terminate Mother's parental rights alleging that she was mentally incompetent to parent the child under Tennessee Code Annotated § 36-1-113(g)(8) and that she had abandoned the child pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and Tennessee Code Annotated § 36-1-102(1)(A)(iv).  Following a trial, the trial court terminated Mother's parental rights upon both grounds pled by DCS.  Although on appeal we conclude that the abandonment ground was not proven by clear and convincing evidence, we affirm the trial court's judgment in all other respects.


**Tenn. R. App. P. 3 Appeal of Right; Judgment of the Juvenile Court Affirmed in Part, Reversed in Part; Case Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which BRANDON O. GIBSON, J., and KENNY ARMSTRONG, J., joined

John Philip Parsons, Cookeville, Tennessee, for the appellant, D. E. D.

Herbert H. Slatery, III, Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee for the appellee, Tennessee Department of Children's Services.

# OPINION

## Background

The minor child at issue in this case, Britteny D.[1] ("the Child"), was born on January 7, 2014, while her mother, D.E.D. ("Mother"), was on a two-month furlough from the White County Jail. Although the record does not unequivocally indicate why Mother had been serving jail time during her pregnancy, her sentence appears to have been the result of a violation of probation from a prior joyriding charge.[2] At the end of her permitted leave on furlough, Mother returned to the White County Jail.

Following Mother's return from furlough, DCS case manager Alicia Wright ("Ms. Wright") traveled to the jail to inquire into the status of the Child's care. After Mother informed Ms. Wright where the Child was supposedly located, Ms. Wright went to investigate the situation. Based on the circumstances discovered in the investigation concerning the Child's care, DCS promptly filed a petition to declare the Child dependent and neglected. On February 26, 2014, the Child entered the protective custody of DCS, and on May 8, 2014, the Putnam County Juvenile Court declared the Child dependent and neglected pursuant to Mother's stipulation.

The present action was commenced on June 12, 2014, by the filing of DCS's "Petition for Termination of Parental Rights." The petition sought to terminate Mother's[3] parental rights on two grounds. First, the petition alleged that Mother had abandoned the Child pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and Tennessee Code Annotated § 36-1-102(1)(A)(iv). Second, the petition alleged that Mother was incompetent to adequately provide for the Child's care and supervision pursuant to

---

[1] In cases involving minor children, it is the policy of this Court to use the initials of children and parties to protect the privacy of the children involved. Although the caption of this case lists the Child's name as "Brittany," we note that the spelling listed on the Child's birth certificate is "Britteny."

[2] At trial, a family service worker with DCS testified that she thought Mother's incarceration was due to a violation of her probation associated with a prior joyriding charge. Nevertheless, the witness stated that she could not remember the specific basis for Mother's sentence. Mother testified that her sentence was a result of a joyriding charge from *Putnam* County. In a May 2014 order where the Child was found dependent and neglected, the trial court indicated that when DCS interviewed Mother at the White County Jail following her return from furlough, Mother stated that she was serving time for violation of probation charges from White County and would also have to serve time for additional violation of probation charges from Putnam County.

[3] The petition also sought to terminate the parental rights of the putative father, S.S.M.H. This appeal only concerns the termination of Mother's parental rights. On October 15, 2014, prior to the trial in this cause, S.S.M.H. executed a waiver pursuant to Tennessee Code Annotated § 36-1-111(w), freeing the Child for adoption.

2

Tennessee Code Annotated § 36-1-113(g)(8). At the time of the filing of the petition, Mother was still incarcerated in the White County Jail. Although she was released from jail in September 2014, she did not stay out of the jail system for long. About five days following her release, Mother was rearrested and jailed in Putnam County. She was subsequently extradited to New Mexico, where she remained as of the date of trial.[4]

A trial on the issues raised in DCS's petition was held on December 16, 2014. The proof consisted of both oral testimony and documentary exhibits. Among the exhibits introduced into evidence were a number of self-authenticating documents from prior legal proceedings. These documents included, *inter alia*, prior criminal judgments against Mother[5] and pleadings from the dependency and neglect litigation concerning the Child.

On December 17, 2014, the trial court entered a "Final Decree of Guardianship." Within the decree, the trial court determined by clear and convincing evidence that Mother had abandoned the Child and was incompetent to parent. Moreover, it concluded that DCS had proven by clear and convincing evidence that the Child's best interests would be served by forever terminating Mother's parental rights. Following the termination of her parental rights, Mother initiated this timely appeal.

**Issues**

In her appellate brief, Mother raises two issues for our review, slightly re-stated as follows:

1. Whether the trial court properly found that the Child was abandoned.

2. Whether the trial court properly found that Mother was incompetent to parent.

**Standard of Review**

Although parents have a fundamental right to the care, custody, and control of their children under both our state and federal constitutions, the right is not an absolute one. *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007) (citations omitted). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re*

---

[4] It appears Mother's legal proceedings in New Mexico are related to the prior joyriding charge in Tennessee. At trial, she testified that her current charge in New Mexico is "theft of property, joyriding. The same charge from Tennessee."

[5] Noticeably absent, however, is any judgment pertaining to Mother's incarceration in 2013-2014.

*Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at \*6 (Tenn. Ct. App. Apr. 27, 2015), *no perm. app. filed*. Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental rights must prove two things. First, they must prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Second, they must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at \*2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.* (citations omitted).

**Discussion**

In this appeal, Mother has challenged both of the grounds upon which the trial court terminated her parental rights. We turn first to a review of the trial court's finding that Mother abandoned the Child by engaging in conduct prior to her incarceration that exhibited a wanton disregard for the Child.[6] This definition of abandonment, which is found in Tennessee Code Annotated § 36-1-102(1)(A)(iv), reads as follows:

---

[6] As DCS has observed on appeal, although Mother raises the trial court's abandonment finding as an issue for review, she appears to misapprehend the category of abandonment that was actually tried. Whereas the trial court found that Mother abandoned the Child under the second test of Tennessee Code Annotated § 36-1-102(1)(A)(iv), Mother's appellate brief attempts to implicate issues that are not relevant to this category of abandonment. For example, the argument section of Mother's brief contains no discussion concerning whether Mother's pre-incarceration conduct exhibited a wanton disregard for the Child. Rather, her argument on the abandonment ground focuses almost entirely on the definition of abandonment under Tennessee Code Annotated § 36-1-102(1)(A)(i), in addition to suggesting error on account of the fact that DCS's petition was filed less than four months after Mother's incarceration following furlough. Neither of these issues pertain to the statutory finding made by the trial court under Tennessee Code Annotated § 36-1-102(1)(A)(iv). As such, we observe that Mother's brief fails to comply with the requirements of Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure. In part, Rule 27(a)(7) requires that the argument section of an appellant's brief shall contain "the contentions of

4

**A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child**, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, **and** either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or **the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child**[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2014) (emphasis added). As this Court has previously observed, this statute "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. Indeed, the "decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* (citation omitted). With that said, an incarcerated parent can only be found guilty of abandonment under the second test of Tennessee Code Annotated § 36-1-102(1)(A)(iv) "if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Under the statute, "the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

It should be noted that although Tennessee Code Annotated § 36-1-102(1)(A)(iv) does not define what conduct constitutes "wanton disregard," Tennessee courts have consistently held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *E.g., Id.* at 867-68 (citations omitted). "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-

---

the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" Tenn. R. App. P. 27(a)(7). Here, Mother has simply failed to include any argument relevant to the category of abandonment actually found by the trial court. Failure to comply with Rule 27(a)(7) constitutes a waiver of the issue. *See Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000) (citations omitted). Notwithstanding Mother's waiver, we exercise our discretion to review the trial court's abandonment finding due to the gravity of the determination involved. *See In re Justin K.*, No. M2012-01779-COA-R3-PT, 2013 WL 1282009, at *8 n.6 (Tenn. Ct. App. Mar. 27, 2013).

COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015), *no perm. app. filed*. When determining whether a parent has exhibited a wanton disregard for a child's welfare, courts are not limited to considering acts occurring during the four-month period immediately preceding the parent's incarceration. *In re Audrey S.*, 182 S.W.3d at 871.

In this case, there is no dispute that Mother has a checkered criminal history. At trial, DCS family service worker Donna Brock ("Ms. Brock") testified that Mother had been arrested more than forty times in Putnam County alone since 2002.[7] According to Ms. Brock's testimony, Mother's criminal history included convictions for writing worthless checks, forgery, theft, and violations of probation. In part, this extensive criminal history contributed to the termination of Mother's parental rights to three other children in 2008. *See In re C.L.D.*, No. M2008-02805-COA-R3-PT, 2009 WL 1684667, at *7 (Tenn. Ct. App. June 15, 2009) (finding that Mother's extensive criminal history supported a finding that Mother engaged in conduct exhibiting a wanton disregard for the welfare of her children). In its brief, DCS relies heavily on this criminal history as evidence that Mother engaged in conduct representing a wanton disregard for the Child's welfare. Having thoroughly reviewed the record, however, we cannot agree that clear and convincing evidence exists to support a finding that Mother abandoned the Child based on her prior criminal history.

In reviewing whether Mother abandoned the child via "wanton disregard," we must focus our attention on Mother's actions prior to her return to the White County Jail following furlough. When the trial court terminated Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv), it made the following findings of fact:

> The Respondent, [Mother] engaged in such conduct prior to incarceration as to exhibit a wanton disregard for the welfare of the child. The Respondent's conduct in wanton disregard for the welfare of the child was her habitual criminal activity resulting in multiple arrests, including while she was pregnant and after the child was born, her failure to parent any of her children, her failure to address her mental health issues, her lack of stable income and lack of stable housing.

Although there is no denying that Mother's criminal history is varied and extensive, the trial court's findings of fact erroneously state that Mother's recent incarceration in the White County Jail was attributable to conduct she engaged in both during pregnancy and following the Child's birth. With regard to the period following the Child's birth, we note that Mother's return to jail was due solely to the expiration of the furlough period. The record does not support any other conclusion. Thus, whereas the trial court's order specifically links Mother's "habitual criminal activity" with the time period "after the child was born," this association is not tenable. Although Mother's incarceration

---

[7] She also stated that Mother had been arrested in other Tennessee counties.

following the Child's birth was certainly the consequence of criminal behavior, there is nothing in the record to support the conclusion that the offending behavior was actually engaged in following the Child's birth. Mother's return to jail was not due to the commission of a new crime. Rather, it resulted from the end of the furlough period.

Of course, this does not end the inquiry. We note that "[i]n the context of 'wanton disregard for the welfare of the child,' our courts have extended the definition of 'child' to include the period of pregnancy." *In re Anthony R.*, 2015 WL 3611244, at *3 (citations omitted). Although the trial court's order states that Mother's "habitual criminal activity" occurred "while she was pregnant," this is not supported by the evidence. From our review of the record, we can discern only that Mother was incarcerated during her pregnancy with the Child due to an apparent probation violation stemming from a prior joyriding charge. Whether Mother actually violated her probation during pregnancy is unknown. Indeed, absent from the record is any indication as to *when* Mother's probation violation occurred. It is entirely possible that Mother violated probation prior to the child's conception and was only later arrested and jailed for her offense. To this end, the trial court's order assumes a fact that is not established.[8] Because there is no evidence as to when Mother's probation violation occurred, we cannot conclude that Mother's decision to continue to engage in criminal behavior reflects a wanton disregard for the Child's welfare. *See id.* (noting that the "wanton disregard language . . . must be construed to require that the [parent] has knowledge of the child at the time [his or her] actions constituting wanton disregard are taken").

Although the trial court's order also cites Mother's "failure to parent any of her children, her failure to address her mental health issues, [and] her lack of stable income and lack of stable housing" as representing wanton disregard for the Child, there is an absence of clear and convincing evidence in the record to support a finding of abandonment based on these other considerations. Ostensibly, the trial court's reference to these other issues is based on Ms. Brock's testimony. We observe that during her testimony, Ms. Brock recalled various conversations she had with Mother concerning Mother's housing, employment history, and mental health needs. Having reviewed Ms. Brock's testimony, we find nothing in it that clearly demonstrates that Mother's pre-incarceration conduct evidenced a wanton disregard for the Child.[9] Because there is an

---

[8] As noted previously, the trial testimony did not clearly indicate the specific basis for why Mother was incarcerated during her pregnancy with the Child. Although her incarceration appears to be the result of a violation of probation from a prior joyriding charge, *see supra*, there is no evidence concerning when this violation of probation occurred. Absent a temporal marker, this criminal conduct cannot be considered as a basis to show that Mother exhibited wanton disregard for the Child's welfare. In addition to the lack of a temporal marker by way of testimony, we note that the exhibits introduced at trial are similarly inconclusive. Although two prior criminal judgments against Mother were admitted into evidence, these judgments dated back to January 2012, a period well before the Child was ever conceived.

[9] Examined closely, Ms. Brock's testimony does three things concerning the topics of housing, employment, and mental health: (1) recounts Mother's attitude during her incarceration; (2) discusses

7

absence of clear and convincing evidence that Mother exhibited a wanton disregard for the Child, the trial court's abandonment finding must be reversed.

We now turn to the trial court's finding that Mother was incompetent to parent. In order to establish a parent's incompetence as a ground for termination, the party seeking termination must prove, by clear and convincing evidence, that:

>   (i)    The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) (2014). Under this ground for termination, "no willfulness in the failure of the parent . . . to establish the parent's . . . ability to care for the child need be shown to establish that the parental . . . rights should be terminated[.]" *Id.* § 36-1-113(g)(8)(C).

In declaring that Mother's rights should be terminated due to her mental incompetence, the trial court made the following findings:

>   18. [Mother] is incompetent to adequately provide for the further care and supervision of [the Child], because her mental condition is presently so impaired and is so likely to remain so that it would be unlikely that she will be able to assume or resume the care of and responsibility for the children in the near future. William R. Sewell, Ph.D. evaluated [Mother] when her older children were in custody and found that [Mother] exhibits an unwillingness or inability to change, fails repeatedly to plan ahead, places the children in unsafe situations and defers to her mother in situations involving child care. It was the evaluator's opinion that these dependency and antisocial characteristics are not likely to change in the near future and therefore [Mother] will not be able to resume independent care of and responsibility for her older children . . . in the near future.
>
>   [Mother's] ongoing criminal history and failure to parent any of her children demonstrates an ongoing incompetency to parent a child.

---

Mother's actions following her release from the White County Jail in September 2014; and (3) generally establishes that Mother has had past problems with housing and other issues. Suffice it to say, there is nothing in Ms. Brock's testimony regarding Mother's pre-incarceration conduct—either immediately following the Child's birth or during the period of pregnancy—that clearly and convincingly establishes Mother exhibited a wanton disregard for the Child due to housing issues, employment issues, or the failure to address her mental health.

8

19. On 9-11-08 the Juvenile Court of Putnam County, Tennessee found [Mother] to be incompetent to parent her children.

20. Therefore her parental rights to [the Child] should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(8).

As is evident from its order, the trial court predicated its finding of incompetence on (1) a previous evaluation by Dr. William R. Sewell, (2) a prior finding of incompetence from 2008 termination proceedings concerning other children, and (3) Mother's ongoing criminal history. As we perceive it, the trial court cites these considerations to reason that Mother's current mental impairment is demonstrated by way of her continued criminal activity.

Having reviewed the record transmitted to us on appeal, we agree with the trial court that there is clear and convincing evidence to support a finding of mental incompetence. As previously indicated, the trial court's order concludes that Mother's present incompetence is clearly demonstrated in light of the prior finding of incompetence and her continued criminal behavior. We note that significant support for this finding is established by the trial testimony of Mr. Jeffery Herman ("Mr. Herman"), a licensed professional counselor and senior psychological examiner.[10] In March 2014, Mr. Herman performed a psychological evaluation of Mother. Although Mr. Herman testified that he was not able to make a diagnosis from this recent evaluation because Mother had declined an IQ test and the results of her mental health assessment were invalid,[11] his comments nonetheless provide clear support that Mother remains presently impaired.

Mr. Herman testified that he previously examined Mother in 2007. Following his 2007 evaluation, Mr. Herman diagnosed Mother with adult antisocial behavior and a personality disorder. He also found that she was of borderline intellectual functioning with an IQ in the 70s. Although Mr. Herman stated that a person with such an IQ could reach the point where he or she could parent independently with specialized instruction,[12]

---

[10] Although the trial court did not directly reference Mr. Herman's testimony in its analysis of Mother's mental condition, we note that his testimony provides convincing support for the trial court's finding that Mother is presently impaired. In this vein, we observe that the trial court found all of DCS's witnesses to be credible.

[11] Mr. Herman's report from the March 2014 evaluation states that the results of Mother's mental health assessment "were invalid due to indications that she was presenting herself as unrealistically virtuous and well adjusted."

[12] In his 2014 report, Mr. Herman noted that Mother lacked important parenting knowledge with respect to several safety issues. For example, Mr. Herman observed that Mother was not able to describe how to manage a minor cut or how to intervene in a choking emergency. Although he noted that nothing would

he noted that not all of the findings from his 2007 evaluation could be subject to effective treatment.  Specifically, he noted that his 2007 assessment yielded a finding that Mother had an elevation on the PD scale from the MMPI-2.[13]  In stating that "PD" stands for psychopathic deviance, Mr. Herman explained that the PD scale "is associated with people who lack regard for the law, the rights of others, and fail to profit from experience."  He testified that people who have an elevated PD scale tend to repeat behaviors even though they are punished for them and further stated that there are no demonstrated treatments for that condition.  When asked by counsel for DCS to address the relevancy of Mother's continuing criminal behavior following his 2007 evaluation, Mr. Herman opined that proof of such continued behavior would indicate Mother had a poor prognosis for treatment and changing her behavior in the near future.  We find no error in the trial court's conclusion that Mother was incompetent under Tennessee Code Annotated § 36-1-113(g)(8).

Despite our conclusion that a statutory ground for termination exists, such proof does not by itself justify the termination of a parent's parental rights.  "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest."  *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citation omitted), *perm. app. denied* (Tenn. Mar. 5, 2014).  As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest."  *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

Having reviewed Mother's brief, we observe that it fails to raise the trial court's findings regarding the Child's best interests as an issue for our review.[14]  Although this results in waiver of the best interests issue on appeal, *see State v. Freeman*, 402 S.W.3d 643, 653 (Tenn. Ct. App. 2012) (citation omitted), we nonetheless exercise our discretion to review the trial court's findings concerning the Child's best interests due to the gravity of the consequences involved in the termination of Mother's parental rights.  *See In re Justin K.*, 2013 WL 1282009, at *8 n.6 (exercising discretion to address the minor child's "best interests" on appeal notwithstanding a waiver by the appellant on the issue).  When

---

necessarily prevent Mother, with the proper training, from parenting a child, he also observed that a person who repeatedly commits criminal acts and is incarcerated is not able to fulfill the parenting role.

[13] MMPI is an acronym for the Minnesota Multiphasic Personality Inventory.  As Dr. Herman noted in his 2007 report, the MMPI-2 "is a self-report instrument designed to provide information concerning a client's personality, pathology, and interpersonal relationships."

[14] Rule 27(a)(4) of the Tennessee Rules of Appellate Procedure provides that the brief of the appellant shall contain, "under appropriate headings," "[a] statement of the issues presented for review[.]"  Tenn. R. App. P. 27(a)(4).

conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (citations omitted). In Tennessee, the Legislature has codified a list of nine, non-exclusive factors that trial courts are to consider when conducting a best interests inquiry in termination of parental rights proceedings. These factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2014). "Ascertaining a child's best interests does not call for a rote examination" of these factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

In its final order, the trial court stated that the following findings clearly demonstrated that terminating Mother's parental rights was in the Child's best interests:

1. [Mother] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent. Tenn. Code Ann. § 36-1-113(i)(1) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

2. [Mother] has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible. Tenn. Code Ann. § 36-1-113(i)(2) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

3. A meaningful relationship has not been established between the child and [Mother]. Tenn. Code Ann. § 36-1-113(i)(4) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

4. A change of caretaker and physical environment is likely to have a negative effect on the child's emotional condition. Prior to foster care this child had a very unstable home life. The child has had stability in the foster home. Tenn. Code Ann. § 36-1-113(i)(5) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

5. [Mother] has committed brutality, physical, sexual, emotional or psychological abuse or neglect toward other child in the family or household. Tenn. Code Ann. § 36-1-113(i)(6) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

12

6.      There has been criminal activity in [Mother's] home as is evidenced by her repeated incarcerations. Tenn. Code Ann. § 36-1-113(i)(7) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

7.      [Mother's] mental and/or emotional status would be detrimental to the child and/or prevent her from effectively providing safe and stable care and supervision for the child. Tenn. Code Ann. § 36-1-113(i)(8) requires the court to consider this factor in determining whether termination of parental rights is in the best interest of the child.

8.      [Mother] has shown little or no genuine interest in the welfare of the child.

9.      [Mother] continue[s] to make lifestyle choices that prevent her from being able to parent the child or to provide a home for the child.

10.     The child is placed in a foster home that wishes to adopt the child.

11.     The child has established a strong bond with the foster parents.

12.     The child needs to be released from the stigma of being a foster child.

Having reviewed the record, we agree that clear and convincing evidence exists to support the trial court's determination that termination of Mother's parental rights is in the Child's best interests. As such, we hereby affirm the termination of Mother's parental rights to the Child.

## Conclusion

The judgment of the trial court is affirmed in part and reversed in part. Although we reverse the trial court's finding that Mother abandoned the Child pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv), we affirm the trial court's judgment in all other respects. Costs of this appeal are assessed against the Appellant/Mother, D.E.D., for which execution may issue if necessary. This case is remanded to the trial court for the collection of costs, enforcement of the judgment, and for such further proceedings as may be necessary and are consistent with this Opinion.

_____
ARNOLD B. GOLDIN, JUDGE