IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 26, 2016 Session

**IN RE TRENTON W.**

**Appeal from the Chancery Court for Sumner County**
**No. 2013AD32      Louis W. Oliver, III, Chancellor**

_____

**No. M2015-01223-COA-R3-PT – Filed May 31, 2016**
_____

This appeal arises from the termination of a mother's parental rights. When the child turned six months old, a juvenile court found Mother and Father's child dependent and neglected and placed the child in the custody of the paternal grandparents. After having custody for nearly five years, the paternal grandparents filed a petition for termination of Mother's and Father's parental rights and for adoption in chancery court. The trial court terminated Father's parental rights at a separate hearing. At the hearing on Mother's parental rights, the trial court found clear and convincing evidence that Mother, who was incarcerated when the petition to terminate was filed, abandoned the child. The court also found it to be in the best interest of the child to terminate Mother's parental rights. Mother appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J. delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and RICHARD H. DINKINS, J., joined.

Joe R. Johnson, II, Springfield, Tennessee, for the appellant, Lindsay B.

Joe D. Harsh, Gallatin, Tennessee, for the appellees, Scott W. and Jennifer W.

## OPINION

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Trenton W. tested positive for opiates and tetrahydrocannabinol[1] when he was born in June of 2008. Unsurprisingly, his mother, Lindsey B. ("Mother"), who was a minor at the time of Trenton's birth, tested positive for opiates and marijuana during her pregnancy. Mother brought Trenton home from the hospital, but a representative of the Tennessee Department of Children's Services ("DCS") arrived within a week. Because of her positive drug test, Mother was not permitted to have unsupervised contact with Trenton.

Mother lived in the home of her mother ("Maternal Grandmother") along with Trenton's father, Cody W. ("Father"). Within two weeks, Father left the home. According to Maternal Grandmother, because neither Mother nor Father could have unsupervised contact with the child, she required help to care for Trenton and that assistance came from several individuals, including Father's father, Scott W., and step-mother, Jennifer W. (together, "Grandparents"). Apparently, during this time period, both Father and Mother also continued to fail drug tests.

Ultimately, sometime in August 2008, Grandparents filed a petition to declare Trenton dependent and neglected in the Juvenile Court for Sumner County, Tennessee. On September 18, 2008, the juvenile court entered an order awarding temporary legal and physical custody to Maternal Grandmother and Scott W. ("Paternal Grandfather") on alternating weeks. The juvenile court also ordered that Mother and Father not have unsupervised contact with Trenton and that Mother and Father complete intensive outpatient drug and alcohol treatment.

Mother and Maternal Grandmother both opposed the Grandparent's petition, but following a hearing on December 18, 2008, the juvenile court found Trenton dependent and neglected. The juvenile court also awarded custody of the child to Grandparents and granted Mother and Father "parenting time." In the case of Mother, the court allowed parenting time from Wednesday at 4:30 p.m. to Thursday at 7:15 a.m. each week and every other weekend from Friday at 6:00 p.m. to Sunday at 6:00 p.m. The court also made provision for Mother and Father to exercise parenting time during certain holidays. The court also indicated it would review the arrangement after six months.

Following the six month review hearing, on June 17, 2009, the juvenile court entered

---

[1] Tetrahydrocannabinol or THC "is a marijuana metabolite that is stored in fat cells and can be detected in the body up to thirty days after smoking marijuana." *Interstate Mech. Contractors, Inc. v. McIntosh*, 229 S.W.3d 674, 677 (Tenn. 2007).

an agreed order. The agreed order basically kept the prior custody and visitation arrangement in place with minor modifications. The agreed order further provided for a review after six months.

Not long after the review hearing, Mother began a four and one-half month stay at New Life Lodge, a substance abuse treatment center. After her release, she did well at first, but her troubles persisted and continued into adulthood. After she turned 18 years old, Mother was arrested and/or incarcerated multiple times for various crimes, including domestic assault, probation violations, aggravated burglary, and possession of illegal drugs. In August 2013, Mother began serving a one year sentence for violation of her probation.

On October 16, 2013, Grandparents filed a petition for termination of parental rights and to adopt Trenton in the Chancery Court for Sumner County. As grounds against both parents, Grandparents asserted abandonment by willful failure to visit and support and failure to manifest the ability and willingness to assume legal and physical custody of the child. Additionally, against Mother alone, Grandparents asserted abandonment by wanton disregard of an incarcerated parent and that placing the child in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Father never responded to the petition for termination of parental rights, and the trial court conducted a separate hearing regarding his rights on December 16, 2013. On January 6, 2014, the court entered an order terminating Father's parental rights, concluding that all the grounds set forth in Grandparent's petition against Father had been established and that termination of Father's parental rights was in Trenton's best interest.

The trial court heard the petition against Mother on April 8 and May 7, 2015. Grandparents, Mother, Maternal Grandmother, the child's therapist, the step-son of Paternal Grandfather, and a case manager with Volunteer Behavioral Healthcare Services testified. At the commencement of the hearing, counsel for Grandparents stated that they were only proceeding on the grounds of abandonment by failure to visit, failure to support, and wanton disregard.[2] *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (Supp. 2015).

At the hearing, Grandparents both testified that they received no financial support from Mother during the four month period preceding her most recent incarceration or ever. Grandparents also testified that, when taking Trenton to Maternal Grandmother's home every other weekend for visitation prior to Mother's most recent incarceration, they never saw Mother and that Maternal Grandmother always returned Trenton. As a result, Grandparents

---

[2] The grounds asserted against Mother under Tenn. Code Ann. § 36-1-113(g)(9)(iv) and (v), failure to manifest the ability and willingness to assume legal and physical custody of the child and custody would pose a risk of substantial harm to the physical or psychological welfare of the child, were inapplicable because Mother was the legal parent of Trenton. *See* Tenn. Code Ann. §§ 36-1-113(g)(9), 36-1-102(28)(A)(i).

3

assumed that Mother was not present for the visitations. Grandparents did state that Mother was present for the child's birthday party, which was held in June 2013.

Grandparents' testimony also stressed the limited time Mother had spent with Trenton. Grandparents and Maternal Grandmother mutually agreed that the visitation from Wednesday evenings until early Thursday mornings originally ordered by the juvenile court was too difficult for the child once he began school, so since January 2013, Mother could only have spent time with Trenton every other weekend. In addition, Grandparents produced an exhibit showing that Mother had served 575 days in jail since reaching adulthood, which prevented her from exercising visitation altogether.

Finally, Grandparents expressed concerned over the impact Mother's involvement might be having on Trenton. Paternal Grandfather testified regarding an incident on May 18, 2011, when he arrived at the home of Maternal Grandmother to pick up Trenton. He found five police cars at the home, and he later learned that Mother was arrested for aggravated burglary. In December 2012, Jennifer W. testified to observing abnormal behavior following the child's visits at the home of Maternal Grandmother, which they assumed included Mother. Jennifer W. testified that the child would scream and tell her that he did not have to listen to her. She also claimed that the child would bite his sleeves, shut doors, and insist that all the lights be on. In January 2013, Grandparents took the child to a therapist.

The child's therapist initially began seeing Trenton weekly. She observed the child was chewing on his clothing and was very active with a very short attention span. In relation to other 5-year-olds, she found his attention span significantly shorter. She diagnosed Trenton as having "an adjustment disorder with anxious features." On cross-examination, the therapist conceded that such a disorder can arise from custody disputes. She noted that, over time, Trenton's anxiety had lessened and that she was now only seeing him once every one to two months.

Maternal Grandmother testified regarding the care of Trenton and the problems experienced by her daughter. Although Paternal Grandfather's son lived with her and her daughter, Maternal Grandmother had not met Grandparents until Trenton was born. Because of Father's and Mother's substance abuse issues, neither could be left alone with the child, and Maternal Grandmother needed assistance caring for Trenton when she had to be at work. Maternal Grandmother saw Grandparents' offer to assist with care as a panacea. When she started to look for daycare options, Maternal Grandmother testified it was Jennifer W. who suggested that Trenton stay with them. Gradually, Grandparents began caring for Trenton more, offering to let the child stay with them rather than having Maternal Grandmother pick him up. Maternal Grandmother thought everyone was simply caring for the child together, but then she was served with the dependency and neglect petition.

4

Maternal Grandmother acknowledged Mother's problems. Maternal Grandmother testified about Mother pushing her head and face into a wall in late 2010, resulting in Mother's arrest and a jail stay for domestic assault. Maternal Grandmother described the incident as isolated, arising from an argument between her ex-husband, Mother's father, and Mother. Maternal Grandmother sought and obtained an order of protection against Mother in May 2011. However, Maternal Grandmother regretted taking that step, testifying that she was encouraged to do so by Jennifer W. and was concerned over not being able to see Trenton as long as Mother remained in her home. Maternal Grandmother also testified that the order of protection was unnecessary because Mother went to jail shortly thereafter. Maternal Grandmother ultimately dismissed the order of protection proceeding because she wanted her daughter to be able to see Trenton once she was released from jail.

Despite Mother's failings, Maternal Grandmother felt Mother had made progress since her last incarceration. Maternal Grandmother was not ready to give up on Mother, and Maternal Grandmother did not support the termination of Mother's parental rights.

Mother testified last; at the time she was pregnant and within a few days of her due date. Mother attributed part of her troubles to the divorce of her parents and her tumultuous relationship with Father, who Mother claimed abused her and introduced her to drugs. However, Mother also acknowledged her own responsibility and the downward spiral resulting from her mistakes. She testified as follows:

> I -- honestly I put myself in some situations and around a lot of people that I should have never been around. The decisions I made -- I had a lot of pain. I was feeling like I wasn't good enough for my son. I felt like I wasn't good enough for really anybody. And I gave myself -- I gave myself things that weren't good enough for me. I really needed help with that, and I needed counseling and stuff. And I just didn't take that initiative. I just stayed swimming in this abyss of wrongs, of mistakes that I just kept making.

Mother felt she had turned herself around during her year in jail. While in jail, she had started a program called "Transition to Recovery," which was offered by Volunteer Behavioral Healthcare Services, and Mother was still participating in the program as of the hearing date. Mother's case manager testified that Mother had greatly improved since entering the program. According to the case manager, Mother had participated in a GED program and had learned to make good, healthy decisions.

Mother claimed she had not used drugs since 2012, but shortly before her last stay in jail, in June 2013, she was pulled over in Maternal Grandmother's vehicle and 17.7 grams of marijuana and digital scales were found in the vehicle console. Rolling papers were found in Mother's purse, and in the driver's side door storage compartment, there was a cigarette pack with a bowl in it. Mother testified that the items had been left in the vehicle by a prior

5

occupant, a former boyfriend. She also testified that the former boyfriend had probably put the rolling papers in her purse.

Mother stated she was not going to give up on herself anymore and that she was going to carry on. She committed to making good decisions and avoiding the types of associates that had caused her problems in the past. She acknowledged that becoming pregnant almost immediately after leaving jail was not the best decision, but she wanted to parent both Trenton and her unborn daughter.

On June 8, 2015, the trial court entered a very thorough written order in which it terminated Mother's parental rights. The court found clear and convincing evidence that Mother had abandoned the child by willful failure to support and wanton disregard prior to incarceration. The court concluded that Grandparents failed to prove by clear and convincing evidence that Mother had abandoned the child by willful failure to visit. The court also found clear and convincing evidence that termination was in the child's best interest.

Mother appeals, claiming the trial court erred in concluding that she had abandoned Trenton by willful failure to support and by engaging in conduct that exhibits a wanton disregard for the child. Mother also claims that the trial court erred in concluding that termination of her parental rights was in the child's best interest. Grandparents claim Mother's appeal is frivolous and request damages.

## II. DISCUSSION

Both the state and the federal constitutions protect a parent's right to the custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). Termination proceedings are governed by statute. Tenn. Code Ann. § 36-1-113 (Supp. 2015). Only when a statutory ground for termination exists and termination is in the best interest of the child will a court interfere with this constitutionally protected right. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The party seeking termination has the burden of proof. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Both the existence of a statutory ground for termination and that termination is in the best interest of the child must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Valentine*, 79 S.W.3d at 546 (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). Next, we assess whether those facts constitute clear and convincing evidence that "one of the statutory

grounds for termination exists and if so whether the termination of parental rights is in the best interests of the [child]." *In re Adoption of Angela E.*, 402 S.W.3d 636, 639-40 (Tenn. 2013). We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007)

A. STATUTORY GROUND FOR TERMINATION

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d at 863. The trial court concluded that Mother had abandoned her child under the fourth definition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four month period preceding the filing of the petition to terminate and "contains two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. The definition provides that a parent has abandoned a child if:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

The trial court found that both tests for abandonment under the definition were satisfied. The first test is satisfied if the parent, during the four months immediately preceding his or her incarceration "willfully failed to visit[,] . . . support[,] or . . . make reasonable payments toward the support of the child . . . ." *Id.* The concept of "willfulness" is the same as under other definitions of "abandonment" found in the statute. *In re Audrey S.*, 182 S.W.3d at 865. Consequently, to willfully fail to visit or support a child, a parent must be "aware of his or her duty to visit or support, ha[ve] the capacity to do so, make[] no attempt to do so, and ha[ve] no justifiable excuse for not doing so." *Id.* at 864. Whether a parent failed to support a child is a factual question, but whether the failure was willful for the purposes of the parental termination statute is a question of law. *In re Malaki E.*, M2014-01182-COA-R3-PT, 2015 WL 1384652, at *6 (Tenn. Ct. App. Mar. 23, 2015).

The second test is satisfied if "the parent . . . has engaged in conduct prior to

7

incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). "Wanton disregard" is not a defined term, but "actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Unlike the first test, the second test includes no time frame for examining the parent's conduct.

Mother challenges the trial court's conclusion that she failed both tests for abandonment under Tennessee Code Annotated § 36-1-102(1)(A)(iv). With respect to the first test, Mother argues that the trial court erred in concluding that her failure to pay support was willful. She states that "there was never a court-ordered child support obligation" and her "ability to pay was very much in question." With respect to the second test, Mother argues that the trial court erred in concluding that she had exhibited wanton disregard for Trenton's welfare. She states that there was no indication that she was "unfit" and that "[s]he is getting her life together."

Based upon our review of the record, we conclude that there is clear and convincing evidence of abandonment within the meaning of Tennessee Code Annotated § 36-1-102(1)(A)(iv). Grandparents proved, with the assistance of the guardian ad litem, that Mother willfully failed to support Trenton during the four consecutive months immediately preceding Mother's incarceration. First, although there was no court ordered support obligation in this case, the absence of a court order does not excuse a parent's obligation to support their minor child. *See* Tenn. Code Ann. § 36-1-102(1)(H) (Supp. 2015) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children."). Second, we agree with Mother that "[t]he financial ability, or capacity, of a parent to pay support must be considered in determining willfulness." *In re Mackenzie N.*, No. M2013-02805-COA-R3-PT, 2014 WL 6735151, at *6 (Tenn. Ct. App. Nov. 26, 2014), *perm. app. denied* (Feb. 20, 2015). However, Grandparents presented evidence of Mother's income during the applicable four month period through Mother's interrogatory responses and W-2s, and the guardian ad litem questioned Mother regarding her expenses. Undoubtedly, Mother's criminal activity has burdened her with costs and expenses; yet, the evidence showed some ability for her to pay support during the applicable time period.

Grandparents also proved that Mother's conduct prior to incarceration exhibits a wanton disregard for the welfare of the child. Between the ages of 18 and 23, when she testified at the hearing, Mother had spent 575 days in jail. Her arrests and failed drug tests prevented her from spending time with her son and demonstrated a wanton disregard for his welfare. Although we are hopeful that Mother has in fact turned her life around, Mother's argument on the second test is directed at the wrong period of time, the present. The second test examines conduct prior to incarceration. As Mother concedes, "[t]he proof in this case

8

does show that Mother had a checkered past, as she had numerous instances of incarceration, due to domestic assault, violations of probation, and other criminal charges." Those "other charges" included aggravated burglary, a burglary that literally ended on her doorstep when one of her accomplices was found outside her home.

## B. BEST INTEREST

As we have determined grounds exist for termination of parental rights, we now consider whether parental rights termination is in Trenton's best interest. The focus of the best interest analysis is on the child, not the parent. *In re Malaki E.*, 2015 WL 1384652 at *12. Tennessee Code Annotated § 36-1-113(i) lists nine, non-exhaustive factors for courts to consider in determining whether it is in the child's best interest to terminate parental rights. Tenn. Code Ann. § 36-1-113(i) (Supp. 2015). The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-194 (Tenn. Ct. App. 2004). The court's job is to weigh the evidence in light of the statutory factors and any other relevant factors to determine the best interest of the child. *Id.*

The trial court found all of the statutory factors favor termination. Mother argues the evidence does not support the trial court's findings of fact in its best interest analysis.

We have reviewed the record and agree that there was clear and convincing evidence that termination of Mother's parental rights is in Trenton's best interest. Compelling in this respect is the testimony of the child's therapist. When asked by the guardian ad litem whether Trenton would suffer psychological harm if he were removed from Grandparent's custody, the therapist testified "he would because he views them as his caretakers and he is emotionally bonded to them." Having now spent over seven years in the custody of Grandparents, it is understandable that Trenton would be strongly attached them.

Additionally, despite Mother's claims to the contrary, the evidence suggested that Mother had not made an adjustment of circumstance, conduct, or condition as to make it in the child's best interest to be returned to her. Shortly after getting out of jail in 2014, Mother again found herself pregnant, and as of the date of the hearing, Father was no longer in the picture. Mother was living at times with both of her parents, and she was facing a criminal charge for introduction of intoxicants or drugs into a penal institution.

## C. FRIVOLOUS APPEAL

Grandparents assert that Mother's appeal is frivolous, and they seek an award of damages, consisting of attorneys' fees incurred on appeal and costs. Under Tennessee Code Annotated § 27-1-122 (2000),[3] an appellate court may award damages, including attorney's

---

[3] The statute provides as follows:

fees, against an appellant if an appeal is frivolous or taken solely for delay. The statute authorizing an award of damages for frivolous appeals "must be interpreted and applied strictly so as not to discourage legitimate appeals." *See Davis v. Gulf Ins. Grp.,* 546 S.W.2d 583, 586 (Tenn. 1977) (citing the predecessor to Tennessee Code Annotated § 27-1-122). A "frivolous" appeal is one that is devoid of merit, has little prospect of success, or is lacking in justiciable issues. *See id.*

We do not find this appeal frivolous, and therefore, we decline to award Grandparents their attorneys' fees incurred on appeal and costs.

### III. CONCLUSION

We find clear and convincing evidence that Mother abandoned Trenton by willfully failing to pay child support and showing a wanton disregard for his welfare prior to her incarceration. We also find clear and convincing evidence that termination of Mother's parental rights is in the best interest of the child. Accordingly, we affirm the decision of the trial court.

_____
W. NEAL MCBRAYER, JUDGE

---

When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122 (2000).