IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 7, 2020 Session

IN RE AUSTIN J.

Appeal from the Chancery Court for Marshall County
No. 18300     J. B. Cox, Chancellor

_____

No. M2019-00781-COA-R3-PT

_____

This appeal arises from a petition to terminate the parental rights of a father to his child for the purposes of adoption. The petitioners, the child's mother and her new husband, alleged that the father had abandoned the child both by willfully failing to visit and by willfully failing to support. Following a trial, the court concluded that the petitioners had failed to show that the father's failures to visit or to support were willful. So the court dismissed the petition. On appeal, the petitioners contend that the evidence was clear and convincing that the father willfully failed to support his child. After a review of the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Debbie Zimmerle Boudreaux and Walter Bussart, Lewisburg, Tennessee, and Matthew Wilson, Mississippi State, Mississippi, for the appellants, A.P. and B.P.

Raymond W. Fraley, Jr., Fayetteville, Tennessee, for the appellee, A.J.

OPINION

I.

A.

Austin J. was born to unwed but cohabiting parents, A.P. ("Mother") and A.J. ("Father"). When the child was approximately eight months old, Father robbed a bank

and was incarcerated without bond. During the course of Father's trial, Father and Mother married. But Father and Mother would never live together again. In November 2010, a federal court sentenced Father to 84 months of custody and four years of supervised release.

In 2015, in the Chancery Court of Marshall County, Tennessee, Mother filed for divorce; at the time, Father was still serving his prison sentence. In October 2016, the court entered a divorce decree naming Mother as the primary residential parent, but anticipating Father's supervised release, the court awarded Father twelve days of parenting time a year, which were to be supervised by Mother.

Despite his incarceration, Father had some contact with Austin. Father's parents and occasionally Mother made the four and one-half hour drive so that Austin could visit Father in prison. Mother also took Austin to visit Father during his stay in a Nashville halfway house, and Father visited when he could get a "pass" to leave the halfway house. But after Father's March 1, 2017 release from the halfway house, problems with visitation soon developed.

One of those problems related to Father's family and Mother's sister from whom Mother was estranged. Father's brother had married Mother's sister, and the court found "many issues concerning the use of illegal drugs and arrest" made it not in Austin's best interest to be in their presence. Father also acknowledged that his mother had a prior history of drug use. So there were concerns over who might be present while Father exercised his visitation.

Another problem was Mother's and Father's strained relationship. Although both had met other people, they still interacted for visitation, just not well. Mother complained that Father requested visitation without or on short notice, ignored communications from Mother, and failed to show up for scheduled visits. Although the court ordered that Mother supervise Father's visitation, Father countered that Mother "always wanted to just basically tell me when I'm going to be here, when I'm going to be there."

A series of events in the summer of 2017 resulted in the relationship worsening to the point of court intervention. A burglary and vandalism at the home Mother shared with her boyfriend led her to contact Father's probation officer.[1] In August, Father and Mother could not agree on a new location for a visit after Father decided the previously agreed location was unacceptable. Later that month, Father's discovery of Mother's contact with his probation officer led to a heated phone call. A couple of days after the

---

[1] Mother later testified that she contacted Father's probation officer at the suggestion of the sheriff's deputy who investigated the burglary and vandalism.

call, Mother obtained an ex parte temporary order of protection for herself and Austin against Father.

Both Mother and Father hired attorneys. With the assistance of counsel, Mother and Father reached an agreement on a restraining order, which was exceedingly broad. The order provided that, for a period of one year from September 20, 2017, Father "and his agents are hereby enjoined and restrained from any and all contact with [Mother], specifically from coming about, harassing, following, stalking, molesting, calling, texting, and/or disturbing her at any place she may be or under any circumstances, either directly or indirectly."

B.

Also in September 2017, Mother married her boyfriend, B.P. ("Stepfather"). Together, on December 21, 2017, they filed a petition to terminate Father's parental rights to Austin and for adoption by Stepfather. Mother and Stepfather alleged that "Father last paid child support for the minor child in July of 2017" and that he had "provided no other financial support . . . during the 4 months preceding the filing of the [p]etition." They also alleged that Father "had no contact, physical or otherwise, with the minor child" for more than the four months immediately preceding the filing of the petition.

At trial, several witnesses in addition to Mother, Father, and Stepfather testified. On the issue of Father's visitation, Mother testified that Father's last visitation prior to the petition to terminate occurred on June 4, 2017. From Mother's perspective, the visit seemed to go well. But after the visit, Mother learned that Father may have had Austin around Father's mother and his brother during the course of the visit.

Although there were plans for visits following the June 4 visit, they did not occur for varying reasons. Father called Mother on July 1 asking for a visit that day, but Mother objected due to the lack of notice. Mother also complained about Father not following up on the rescheduling of a Father's Day visit from the previous month. Father did speak with his child by telephone the day Austin had dental surgery in the middle of the month.

Mother and Father agreed to a visit to take place on August 13 at a local restaurant. When the day for the visit came and Mother notified Father she was on her way to the restaurant, Father requested that the visit take place at a park. Mother explained that a health condition prevented her from being outside in the heat. According to Mother, she asked if there was anywhere else they could meet, but Father refused to go anywhere else.

3

In September, Father made an effort to schedule visitation through his counsel. But Mother declined the request. Apparently Father had already filed a petition seeking visitation, and Mother felt that Father should seek visitation through the court. Mother also claimed that, although the agreed restraining order might prevent Father from contacting her about visitation, Father could contact Stepfather to arrange for visitation.

On the issue of Father's child support obligation, Mother testified that the last check she received from Father before the petition to terminate was in July. Father testified that, when the no contact order was entered, he began forwarding his child support payments to his attorney. A January 2018 letter from Father's counsel stated it enclosed a "trust account check made payable to [Mother's] order in the amount of $1,236.00, representing child support payments from August, 2017, through January, 2018." Mother acknowledged receiving the check.

The trial court denied the petition to terminate Father's parental rights. The court concluded that Mother and Stepfather had failed to meet their burden of proving either ground for termination by clear and convincing evidence. On visitation, the court found a pattern of Father attempting to see his child. When the restraining order was entered, Father attempted to arrange for visitation through his attorney and pursued "a legal proceeding to expand his visitation." On support, the court found that Father had paid child support to his attorney after entry of the restraining order. Father's attorney held the payments in anticipation of a visitation hearing and subsequently delivered them to Mother's counsel after the filing of the petition.

## II.

### A.

Based on both the federal and State constitutions, a parent has a fundamental right to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for

4

termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

B.

Mother and Stepfather's sole contention is that the trial court erred in concluding that Father's failure to pay child support was not willful. In light of Father's abandonment of Austin by willful failure to support, they request that we remand the case to the trial court for a determination of whether termination is the child's best interest.

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The parental termination statutes give alternative definitions for "abandonment." *Id*. § 36-1-102(1)(A) (2017) (amended 2018). At the time Mother filed the petition for termination, "abandonment" included "the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i).[2]

---

[2] In 2018, the Legislature amended Tennessee Code Annotated § 36-1-102(1)(A)(i) to delete the word "willfully" from the first definition of "abandonment." *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856) (effective July 11, 2018). Under the current version of the statute, lack of willfulness is an

While the failure to support presents a question of fact, whether that failure is willful presents a question of law. *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). A "[f]ailure to . . . support a child is 'willful' when a person is aware of his or her duty to . . . support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). A failure to support may be excused by the conduct of another if "the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support . . . the child." *Id.* (internal citations omitted).

Here, because the petition to terminate parental rights was filed on December 21, 2017, the relevant four-month period is August 21, 2017, to December 20, 2017. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period). The parties acknowledge that Mother received no support payment during the relevant period. Instead the court found that Father had made his support payments to his attorney.

Mother and Stepfather contend that the court never found that Father made his support payments during the four-month period to his attorney. Instead, they contend that the court found that the Father made payments at some point after the entry of the restraining order, which could have been after the filing of the petition to terminate. The implication is that Father "caught up" on his support payments that were due during the relevant four-month period only after the petition to terminate was filed.

The trial court's memorandum opinion is susceptible to the interpretation placed on it by Mother and Stepfather. But as their counsel conceded at oral argument, the opinion also could be read as finding that Father made his child support payments to his counsel during the four-month period preceding the petition to terminate. When an order or judgment is susceptible to more than one interpretation, "it should be construed with reference to the issues it was meant to decide and should be interpreted in light of the context in which it was entered, as well as the other parts of the record, including the pleadings, motions, issues before the court, and arguments of counsel." *Morgan Keegan & Co., Inc. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) (internal citations omitted).

We accept the interpretation that Father made support payments during the four-month period preceding the petition to terminate because such a finding is consistent with the proof. When asked if he recalled sending a check in the month of August 2017,

---

affirmative defense to a claim of abandonment for failure to visit or failure to support. Tenn. Code Ann. § 36-1-102(1)(I) (2018).

6

Father testified, "I sent her a check every month." When Father was then asked if he sent Mother a check in September 2017, Father testified, "I sent the checks to my attorney." The trial court credited Father's testimony on this issue, and we find no basis to overturn the court's credibility determination. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) ("[F]indings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case."); *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (To the extent the trial court's determination rests upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary.).

Next Mother and Stepfather argue that, even if Father made his support payments to his attorney, he had no excuse for doing so. As they note, the trial court concluded that the restraining order "did not apply to the child and never did." So "Father could have delivered the checks to his son, via US Mail, without violating the [restraining order]."[3] Mother and Stepfather also contend that Father's attorney could have delivered the checks to Mother's attorney during the four-month period.

Having reviewed the restraining order agreed to by the parties and considered its scope, the order did represent a significant restraint of or interference with Father's efforts to support Austin. The restraining order "enjoined and restrained" Father "and his agents . . . from any and all contact with [Mother] . . . either directly or indirectly." We can understand the desire of Father, as a convicted felon on supervised release, to avoid any possibility of violating the court's order and to act with caution.

Under the circumstances, we do not find it unreasonable for Father to send his support checks to his attorney for handling. And we cannot conclude that Father's failure to pay support was willful. While the checks should have been forwarded immediately to Mother's counsel, Father's counsel acknowledges that it was error on his part in not doing so. The record does not support a finding that Father instructed his attorney to withhold the support.

**III.**

We conclude that the evidence was less than clear and convincing that Father abandoned his child by the willful failure to pay support during the four-month period preceding the filing of the petition to terminate parental rights. Because Mother and Stepfather failed to prove by clear and convincing evidence a statutory ground for termination of parental rights, we affirm the dismissal of their petition.

---

[3] The ex parte order of protection is not included in the record, but Mother testified that the order of protection included Austin.

_____
W. NEAL McBRAYER, JUDGE